1 | **KAPLAN FOX & KILSHEIMER LLP**
2 | Laurence D. King (SBN 206423)
   | Kathleen A. Herkenhoff (SBN 168562)
   | Blair E. Reed (SBN 316791)
3 | 1999 Harrison Street, Suite 1560
   | Oakland, CA 94612
4 | Telephone: 415-772-4700
   | Facsimile: 415-772-4707
5 | Email: *lking@kaplanfox.com*
   |        *kherkenhoff@kaplanfox.com*
6 |        *breed@kaplanfox.com*

7 | *Counsel for Plaintiff and for the Proposed Class*

8 | [Additional counsel appear on signature page]

9

10

11 | **UNITED STATES DISTRICT COURT**

12 | **NORTHERN DISTRICT OF CALIFORNIA**

13

14 | JULIE CHON PAPADAKIS, Individually and On Behalf of All Others Similarly Situated, | Case No. 3:23-cv-00024

15 |                                           Plaintiff, | **CLASS ACTION**

16

17 |                    v. | **CLASS ACTION COMPLAINT**

18 | SAMUEL BANKMAN-FRIED, CAROLINE ELLISON, ZIXIAO "GARY" WANG, NISHAD SINGH, ARMANINO LLP, and PRAGER METIS CPAS, LLC, | **DEMAND FOR JURY TRIAL**

19

20 |                                           Defendants.

21

22

23

24

25

26

27

28

Plaintiff Julie Chon Papadakis ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, files this action against Defendants Samuel Bankman-Fried ("Bankman-Fried" or "SBF"), Caroline Ellison ("Ellison"), Zixiao "Gary" Wang ("Wang"), Nishad Singh ("Singh"), Armanino LLP ("Armanino") and Prager Metis CPAs, LLC ("Prager") (collectively the "Defendants").  Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys. The investigation by Plaintiff's attorneys includes, among other things, a review of the public documents and announcements published by Defendants, the Terms of Service and User Agreements that the FTX Entities (defined herein) provided to customers, media reports (including social media statements), documents filed in the United States Bankruptcy Court for the District of Delaware in connection with the bankruptcy filings (the "Bankruptcy Proceedings") by FTX Trading LTD and the other FTX Entities controlled and/or previously controlled by the Individual Defendants named herein (Bankman-Fried, Ellison, Wang and Singh) including, but not limited to Doc Nos. 24 and 225 (and Exhibits C and D thereto) in Case 22-11068-JTD, the Securities and Exchange Commission's (the "SEC") complaint against Samuel Bankman-Fried in the United States District Court for the Southern District of New York ("SDNY") (Civil Action No. 22-cv-10501) (the "SEC Bankman-Fried Action") and the SEC's complaint against Ellison and Wang in SDNY (Civil Action No. 22-cv-10794) (the "SEC Ellison/Wang Action") (collectively the "SEC Actions"), ECF Nos. 3 and 4 in the SEC Ellison/Wang Action consisting of proposed judgments in the action accompanied by signed consents by Ellison and Wang and ECF Nos. 15 and 16 consisting of the December 23, 2022 entered judgments in the SEC Ellison/Wang Action, the SEC's December 13, 2022 and December 21, 2022 Press Releases Nos. 2022-219 and 2022-234 announcing the filing of the SEC Actions ("SEC Press Releases"), the Sealed Indictment in *United States of America v. Samuel Bankman-Fried, a/k/a "SBF"* 22 CRIM 673 in the SDNY (the "Indictment"), the Superseding Information in *United States v. Caroline Ellison*, S2 22 Cr. 673 and Ellison's guilty plea to the Superseding Information, the Superseding Information in *United States v. Zixiao (Gary) Wang*, S1 22 Cr. 673 and Wang's guilty plea to the Superseding

Information, the December 13, 2022 Press Release No. 22-386 issued by the United States Attorneys' Office for the Southern District of New York (the "SDNY U.S. Attorneys' Office") in connection with the Indictment, the initial and amended complaints in *Commodity Futures Trading Commission v. Bankman-Fried, et al.*, Case No. 1:22-cv-10503-PKC filed in the SDNY (the "CFTC Action"), the December 13, 2022 and December 21, 2022 press releases (Nos. 8638-22 and 8644-22) issued by the Commodity Futures Trading Commission (the "CFTC") in connection with the filing and amended filings in the CFTC Action, the entered consent orders as of December 23, 2022 as to Ellison and Wang and filed at ECF Nos. 25 and 26 (as well as the proposed consent orders filed at ECF Nos. 14, 14-1, 15 and 15-1) in the CFTC Action, the December 13, 2022 hearing before the U.S. House of Representatives Committee on Financial Services (the "Committee"), including testimony by John J. Ray III, Chief Executive Officer of the FTX Group ("Ray"), the December 8, 2022 Memorandum from the FSC Majority Staff to the Members of the Committee, press releases and/or statements issued by Congresswoman Waters in connection with the December 13, 2022 Committee hearing, the November 23, 2022 letter from Senators Warren and Whitehouse to Attorney General Garland and Assistant Attorney General Polite, and the December 5, 2022 letter from Senator Warren and others to Alan Lane, CEO of Silvergate Capital Corporation ("Silvergate"), the November 16, 2022 letter from Senators Warren and Durbin to Ray and Bankman-Fried, the November 9, 2022 letter from Christina Rolle of the Securities Commission of the Bahamas to the Royal Bahamas Police Force, Doc 536 in *In re: Voyager Digital Holdings, Inc., et al*, Case No. 22-10943 (MEW), filed in the United States Bankruptcy Court for the SDNY, and additional information in the public domain. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND OVERVIEW OF THE ACTION

1.      This is a class action on behalf of a class consisting of all persons other than Defendants that have deposited funds and/or assets in accounts ("Accounts") with FTX Trading LTD d/b/a FTX ("FTX or "the Company") or West Realm Shires Services Inc. d/b/a FTX US ("FTX.US" or "FTX US") (collectively, the "FTX Entities"), and who have been unable to access

or withdraw the deposited funds and/or assets in the Accounts, seeking to recover damages caused by Defendants' violations of the California Unfair Competition Law (the "UCL"), the California False Advertising Law (the "FAL"), as well as common law claims for fraudulent concealment, negligent misrepresentation, intentional misrepresentation, fraud, breach of fiduciary duty, aiding and abetting fraud, aiding and abetting violations of the UCL, aiding and abetting breach of fiduciary duty, civil conspiracy, conversion, unjust enrichment, and a declaratory judgment.

2. The FTX Entities' replacement CEO Ray – known for serving in a similar capacity to unravel the Enron fraud – testified on December 13, 2022 before the Committee: "This really is old-fashioned embezzlement . . . This is just taking money from customers and using it for your own purpose.  Not sophisticated at all."[1]  As alleged herein, and being currently spilled out in the parade of actions being pursued against Bankman-Fried, Ellison and Wang, the FTX Entities were operated essentially as a Ponzi scheme, with customer funds entrusted to the FTX Entities becoming a casualty of the greed of the Individual Defendants and of their agents, such as the Auditor Defendants, who (upon information and belief) received substantial fees for their active participation in, and/or aiding and abetting of, the conduct alleged herein.

3. In connection with the Indictment, the SDNY U.S. Attorneys' Office issued a December 13, 2022 press release stating, in pertinent part (emphasis added):[2]

> U.S. Attorney Damian Williams said: "One month ago, FTX collapsed, causing billions of dollars in losses to its customers, lenders, and investors.  Now, a federal grand jury in New York has indicted the former founder and chief executive officer of FTX and charged him with crimes related to the **phenomenal downfall** of that one-time cryptocurrency exchange, including **fraud on customers**, investors, lenders, and our campaign finance system.  **As today's charges make clear, this was not a case of mismanagement or poor oversight, but of intentional fraud, plain and simple."**
>
> Attorney General Merrick B. Garland said: "The Justice Department has filed charges alleging that Samuel Bankman-Fried perpetrated a range of offenses in a **global scheme to deceive and defraud customers** and lenders of FTX and Alameda, the defendant's crypto hedge fund, as well as a **conspiracy** to defraud the United States government.  We allege that the defendant **conspired to defraud**

---

[1] *See* https://finance.yahoo.com/news/ftx-founder-facing-charges-ceo-163757322.html?fr=sycsrp_catchall (last visited December 14, 2022).

[2] https://www.justice.gov/usao-sdny/pr/united-states-attorney-announces-charges-against-ftx-founder-samuel-bankman-fried (last visited December 18, 2022).

**customers by misappropriating their deposits; to defraud lenders; to commit securities fraud and money laundering**; and to violate campaign finance laws. . . . ."

FBI Assistant Director Michael J. Driscoll said: "As the indictment today alleges, Bankman-Fried **knowingly defrauded the customers of FTX.com through the misappropriation of the customer deposits to pay expenses and debts of a different company he also owned as well as make other investments**. If you deceive and defraud your customers, the FBI will be persistent in our efforts to bring you to justice."

4.      CFTC Chairman Rostin Benham issued this statement in connection with the filing of the initial complaint in the CFTC Action (emphasis added)[3]:

FTX held itself out as "the safest and easiest way to buy and sell crypto" and represented that customers' assets, including both fiat and digital assets including bitcoin and ether, were held in "custody" by FTX and segregated from FTX's own assets. To the contrary, **FTX customer assets were routinely accepted and held by Alameda and commingled with Alameda's funds**. Alameda, Bankman-Fried, and others also **appropriated customer funds for their own operations and activities**, including luxury real estate purchases, political contributions, and high-risk, illiquid digital asset industry investments. The complaint further alleges that, at Bankman-Fried's direction, FTX employees **created features in the FTX code that favored Alameda and allowed it to execute transactions even when it did not have sufficient funds available**, including an "allow negative flag" and effectively limitless line of credit that allowed Alameda to withdraw billions of dollars in customer assets from FTX. These features were **not disclosed to the public**.

5.      SEC Chair Gary Gensler issued this statement in connection with the filing of the December 13, 2022 SEC Bankman-Fried Action:

We allege that Sam Bankman-Fried built a house of cards on a foundation of deception while telling investors that it was one of the safest buildings in crypto. . . . The alleged fraud committed by Mr. Bankman-Fried is a clarion call to crypto platforms that they need to come into compliance with our laws. Compliance protects both those who invest on and those who invest in crypto platforms with time-tested safeguards, such as properly protecting customer funds and separating conflicting lines of business.[4]

6.      The SEC's Director of Enforcement Gurbir S. Grewal issued this statement in connection with the filing of the December 13, 2022 SEC Bankman-Fried Action (emphasis added):

---

[3] https://www.cftc.gov/PressRoom/PressReleases/8638-22 (last visited December 18, 2022).

[4] https://www.sec.gov/news/press-release/2022-219 (last visited December 18, 2022).

1
2
3

FTX operated behind a veneer of legitimacy Mr. Bankman-Fried created by, among other things, **touting its best- in-class controls, including a proprietary "risk engine," and FTX's adherence to specific investor-protection principles** and detailed terms of service. But as we allege in our complaint, that veneer wasn't just thin, it was **fraudulent**.

4
5
6
7

7.      Director Grewal further stated in connection with the December 13, 2022 filing of the SEC Bankman-Fried Action that the SEC's investigation of others was ongoing, and the SEC was "holding Mr. Bankman-Fried responsible for fraudulently raising billions of dollars from investors in FTX and misusing funds belonging to FTX's trading customers."

8
9
10

8.      In connection with the December 21, 2022 filing of the SEC Ellison/Wang Action, the SEC issued a press release summarizing those allegations (as to which Ellison and Wang have entered consent orders for entry of judgment) in pertinent part, as follows (emphasis added)[5]:

11
12
13
14
15

. . .between 2019 and 2022, Ellison, at the direction of Bankman-Fried, furthered the scheme by manipulating the price of FTT, an FTX-issued exchange crypto security token, by purchasing large quantities on the open market to prop up its price. FTT served as collateral for undisclosed loans by FTX of its customers' assets to Alameda, a crypto hedge fund owned by Wang and Bankman-Fried and run by Ellison. . . . by manipulating the price of FTT, Bankman-Fried and Ellison caused the valuation of Alameda's FTT holdings to be inflated, which in turn caused the value of collateral on Alameda's balance sheet to be overstated, and misled investors about FTX's risk exposure.

16
17
18
19

. . . from at least May 2019 until November 2022, Bankman-Fried raised billions of dollars from investors by **falsely touting FTX as a safe crypto asset trading platform with sophisticated risk mitigation measures to protect customer assets** and by telling investors that Alameda was just another customer with no special privileges; meanwhile, Bankman-Fried and Wang improperly diverted FTX customer assets to Alameda. The complaint alleges that Ellison and Wang knew or should have known that such statements were false and misleading.

20
21
22
23
24

. . . Ellison and Wang **were active participants in the scheme to deceive** FTX's investors and engaged in conduct that was critical to its success. The complaint alleges that **Wang created FTX's software code that allowed Alameda to divert FTX customer funds, and Ellison used misappropriated FTX customer funds for Alameda's trading activity**. The complaint further alleges that, **even as it became clear that Alameda and FTX could not make customers whole, Bankman-Fried, with the knowledge of Ellison and Wang, directed hundreds of millions of dollars more in FTX customer funds to Alameda**.

25
26
27

"As part of their deception, we allege that Caroline Ellison and Sam Bankman-Fried schemed to manipulate the price of FTT, an exchange crypto security token that was integral to FTX, to prop up the value of their house of cards,' said SEC Chair Gary Gensler. 'We further allege that Ms. Ellison and Mr. Wang played an active role in a scheme to misuse FTX customer assets to prop up Alameda and to

28

---

[5] https://www.sec.gov/news/press-release/2022-234 (last visited December 22, 2022).

post collateral for margin trading. When FTT and the rest of the house of cards collapsed, Mr. Bankman-Fried, Ms. Ellison, and Mr. Wang left investors holding the bag. . . ."

"As alleged, Mr. Bankman-Fried, Ms. Ellison, and Mr. Wang were active participants in a scheme to conceal material information from FTX investors, including through the efforts of Mr. Bankman-Fried and Ms. Ellison to artificially prop up the value of FTT, which served as collateral for undisclosed loans that Alameda took out from FTX pursuant to its undisclosed, and virtually unlimited, line of credit," said Sanjay Wadhwa, Deputy Director of the SEC's Division of Enforcement.

9.     Similarly, the CFTC amended the CFTC Action to sue Ellison and Wang, and a proposed consent order to judgment has been filed, and subsequently entered, as to Ellison and Wang in the CFTC Action.

10.     As further detailed herein, the SDNY U.S. Attorneys' Office, SEC and CFTC have now pursued Ellison and Wang for their misconduct, with a sweeping set of announcements on December 21, 2022 of guilty pleas by Ellison and Wang in the criminal proceedings.   Bankman-Fried is expected to enter a plea on January 3, 2023.

11.     This FTX house of cards that has now tumbled down in one of the largest frauds in U.S. history started in 2019, when FTX was started as a cryptocurrency exchange by Bankman-Fried, who served as its Chief Executive Officer ("CEO") until his November 11, 2022 resignation. In 2020, Bankman-Fried also founded FTX's United States ("U.S.") affiliate, FTX.US.

12.     The FTX Entities claimed to offer a range of trading products, including derivatives, options, volatility products, and leveraged tokens. The FTX Entities also purportedly provided spot markets on cryptocurrency trading pairs, including the native token FTT/USDT ("FTT Tokens").  These offerings were to allegedly enable FTX customers to trade with leverage and short certain markets by borrowing from other FTX users.  The FTX Entities' terms of service stated that customer assets belonged solely to the customer and would not be transferred to FTX trading.

13.     In addition, according to statements on the FTX website, "US users cannot trade on FTX, but residents of the United States can trade on FTX.US."

14.     As Ray has now testified to the Committee: "What we're seeing now is that the crypto assets for both FTX.com and for FTX US were housed in the same database" and "all housed in the same web format" reportedly at Amazon Web Services.[6]

15.     As described by media following Ray's testimony, the "dysfunction" at the FTX Entities is "longstanding," with no independent board and no coherent record keeping.[7]

16.     The outline of Ray's testimony for the December 13, 2022 Congressional testimony (available at Doc 225-3 in Case 22-11068-JTD in the Bankruptcy Proceeding) notes:

> Questions have been raised as to why all of the FTX Group companies were included in the Chapter 11 filing, particularly FTX US. The answer is because FTX US was not operated independently of FTX.com. . . . Chapter 11 protection was necessary both to avoid a 'run on the bank' at FTX US and to allow our team the time to identify and protect its assets.

17.     Ray's November 17, 2022 declaration filed in the Bankruptcy Proceedings, and exhibits thereto, provide his description, early in the investigation process, of the corporate organization of the various groups of business of the FTX Entities, which Ray refers to as four "silos", each of which he declares was controlled by Bankman-Fried, with minority interest in the silos held by Wang and Singh.  Ray declares that he was provided an unaudited consolidated balance sheet for the silo comprising the FTX.US side of the business (the "WRS Silo") as of September 30, 2022, but he did not have "confidence in it" as being accurate.

18.     The assets of customers that, as also reported by Ray, have been largely dissipated by the Individual Defendants, were raked in from 2019 to 2022 as a result of a widespread marketing campaign undertaken by the FTX Entities (via the Individual Defendants). The campaign, which included social media posts, interviews, sports partnerships, internet and television advertisements, and naming rights deals, rapidly increased the FTX Entities' valuation, growing from $1.2 billion to $32 billion in only three years.

---

[6] https://www.coindesk.com/business/2022/12/13/with-ftxs-founder-facing-charges-new-ceo-details-lack-of-independence-of-ftx-us/ (last visited January 3, 2023).

[7] https://www.coindesk.com/business/2022/12/13/with-ftxs-founder-facing-charges-new-ceo-details-lack-of-independence-of-ftx-us/ (last visited January 3, 2023).

19.     A key component of the highly lucrative promotional marketing campaign included the air of legitimacy that the Auditor Defendants' purported auditing work and other supportive statements described herein provided to the FTX Entities.  For example, throughout 2021 and 2022, Bankman-Fried represented that the FTX Entities had completed several successful audits under U.S. generally accepted accounting principles ("GAAP"). In March 2022, the Auditor Defendants, Armanino and Prager, reportedly issued certified reports that purportedly found the FTX Entities to be in good financial health (the "Audit Reports").

20.     As stated in paragraph 51 of the complaint in the SEC Bankman-Fried Action, FTX's financial statements were audited and were represented to be presented in a manner that "fairly present in all material respects the financial condition and operating results of" FTX.  The SEC Bankman-Fried Action complaint in paragraph 51 further alleges that, in contrast to these representations, the "[a]udited financial statements' do not include information about Alameda's undocumented 'line of credit' from FTX" and "other information" that was "[a]t the very least, materially misleading.  FTX's current CEO has voiced 'substantial concern as to the information presented in these audited financial statements.'"

21.     The Auditor Defendants issued Audit Reports indicating the good financial health of the FTX Entities.  In addition, the Auditor Defendants bolstered the Individual Defendants' marketing scheme by issuing positive statements about Bankman-Fried and/or the FTX Entities in media postings, as alleged herein.  Armanino and Prager each published what have been coined in the press as "cheerleading" statements in support of Bankman-Fried and the FTX Entities in 2021 and 2022.  These "cheerleading" statements negate any claim of auditor independence by either of the Auditor Defendants, and as a result of the massive fraud undertaken by the FTX Entities and the Individual Defendants, of which numerous red flags dangled in front of the Auditor Defendants, the so-called audits and Audit Reports thereon failed to comport with U.S. generally accepted auditing standards ("GAAS").

22.     Another crucial component of the Bankman-Fried fraud and part of his "cryptocurrency empire" was a Delaware limited liability company known as Alameda Research LLC ("Alameda"), operating as a crypto-trading firm he founded in 2017. Bankman-Fried was

CEO of Alameda until 2021, after which Defendant Ellison served in that role. Bankman-Fried represented to customers that the FTX Entities and Alameda were separate and distinct. In contrast, the December 13, 2022 initial complaint filed in the CFTC Action (the "CFTC Complaint") alleges that from at least May 2019 through at least November 11, 2022, FTX Trading and Alameda and other entities under the majority ownership and control of Bankman-Fried operated as a "single, integrated common enterprise under the sole authority of Bankman-Fried as their mutual owner." In the initial complaint in the SEC Bankman-Fried Action, the SEC similarly alleges that Bankman-Fried "remained the ultimate decision-maker at Alameda . . . ."

23.     Indeed, on November 2, 2022, the beginning of the end for the FTX Entities hit when the cryptocurrency publication _CoinDesk_ published an article entitled "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet".[8]  The _CoinDesk_ article opined that Alameda's balance sheet was made up primarily of FTT tokens, indicating that Alameda "rest[ed] on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto."

24.     Shortly after the _CoinDesk_ article was published, the FTX Entities saw massive customer withdrawals, resulting in a liquidity crisis. Bankman-Fried elected to freeze all withdrawals of customer assets.

25.     On November 8, 2022, Binance, a rival cryptocurrency exchange, announced that it had reached a non-binding deal to acquire FTX. By November 9, 2022, however, Binance backed out, stating that FTX's finances uncovered liquidity issues that were "beyond [Binance's] control or ability to help."

26.     On November 12, 2022, _The Wall Street Journal_ reported that Bankman-Fried, Ellison, Wang and Singh were aware that FTX had used customer assets to cover Alameda's trading losses and repay its outstanding debts.  As Congresswoman Waters stated in connection with the Committee hearing, it is feared that much of what is now coming to light about the fraud at the FTX Entities is only the "tip of the iceberg."

---

[8] https://www.coindesk.com/business/2022/11/02/divisions-in-sam-bankman-frieds-crypto-empire-blur-on-his-trading-titan-alamedas-balance-sheet/ (last visited December 18, 2022).

27.     Bankman-Fried resigned as CEO of FTX, and the FTX Entities and Alameda filed for bankruptcy on November 11, 2022. In a filing in the Bankruptcy Proceedings, new CEO Ray stated that he had never seen "such a complete lack of corporate controls and such a complete absence of trustworthy financial information as occurred here . . . the situation is unprecedented."

28.     As a result of Defendants' wrongful acts as further described herein, Plaintiff and other Class members have suffered, and continue to suffer, significant losses and damages.

## JURISDICTION AND VENUE

29.     The claims asserted herein arise under and pursuant to the California Unfair Competition Law, the California False Advertising Law, as well as common law claims for fraudulent concealment, negligent misrepresentation, intentional misrepresentation, fraud, breach of fiduciary duty, aiding and abetting fraud, aiding and abetting violations of the UCL, aiding and abetting breach of fiduciary duty, civil conspiracy, conversion, unjust enrichment, and declaratory judgment.

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

31.     This Court has personal jurisdiction over Defendants because at least one Defendant conducts business in California, and/or each of the Defendants have otherwise intentionally availed themselves of the State of California's consumer market through the promotion, marketing, and sale of products and services offered by the FTX Entities, including the Accounts, in California.  Accordingly, Defendants committed tortious acts within the State of California. The Individual Defendants have also marketed and participated and/or assisted in the sale of FTX's unregistered securities to consumers in the State of California. In addition, the FTX.US User Agreements in effect from at least May 2020 to September 2022 provided that certain terms were governed by the laws of the State of California without regard to its conflict of law provisions.  Defendants' purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

32.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this Judicial District. Specifically, Alameda was founded in Berkeley, California. In addition, Defendants Bankman-Fried, Ellison, Wang, and/or Singh directed FTX customers to make certain of the deposits in their FTX Accounts by directing wire transfers to FTX.US, which maintained a payee address at 2000 Center Street in Berkeley, California. On information and belief, customers directed millions of dollars to the Defendants' Berkeley address.

33.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, and interstate telephone and/or wire communications.

## DIVISIONAL ASSIGNMENT

34.     Divisional assignment to the San Francisco and/or Oakland Division of the Northern District of California is appropriate pursuant to Civil L.R. 3-2(d) because a substantial part of the events or omissions giving rise to the claims at issue herein occurred in Berkeley, California.  As indicated in the Form D filings for FTX Trading Ltd. with the SEC, Bankman-Fried was listed as the Executive Officer and Director of FTX Trading Ltd. with his business address reflected as 2000 Center Street, Berkeley, California 94704.  FTX.US was the d/b/a for West Realm Shires Services, Inc., an entity located during a substantial portion of the events alleged herein at 2000 Center Street, Berkeley, California 94704, and as to which customers in FTX.US were directed as a point of contact.  Upon information and belief, millions of dollars of customer funds were directed to the Berkeley, California address at the direction of one or more of the Individual Defendants and FTX Entities.  Similarly, upon information and belief, FTX customer funds were deposited into bank accounts controlled by Alameda, including accounts in the name of North Dimension, Inc., an Alameda subsidiary.

## PARTIES

35.     Plaintiff Julie Chon Papadakis deposited funds into an Account with the FTX Entities and has since been unable to withdraw her deposited funds and/or assets. Plaintiff is a resident of Puerto Rico.

36.     Defendant Bankman-Fried is the founder and former CEO of FTX and Alameda. Bankman-Fried is a citizen of the State of California.  On December 12, 2022, Bankman-Fried was arrested in the Bahamas, reportedly at the request of federal prosecutors in New York, and has since been extradited to the United States and is residing at his parent's California residence. Alameda's assets reportedly were involved in making loans of at least $1 billion to Bankman-Fried.

37.     Defendant Ellison is the former CEO of Alameda.  During a portion of the events alleged herein, Ellison was a citizen of, and/or resided in, the State of California.

38.     Defendant Wang is the co-founder of Alameda and FTX and served as FTX's Chief Technical Officer.  During a portion of the events alleged herein, Wang resided in the State of California.

39.     Defendant Singh is the co-founder of FTX and served as FTX's Chief Engineering Officer. During a portion of the events alleged herein, Singh was a citizen of, and/or resided in, the State of California.   Alameda's assets reportedly were involved in making loans of approximately $543 million to Singh.

40.     Defendants Bankman-Fried, Ellison, Wang, and Singh are sometimes referred to herein as the "Individual Defendants."

41.     Defendant Armanino maintains a principal place of business at 12657 Alcosta Boulevard, Suite 500, San Ramon, California, and its website advertises Armanino as an accounting and consulting firm. Upon information and belief, Armanino received fees and other remuneration for engagements or consulting work performed for the FTX Entities.

42.     Defendant Prager has at least five offices in California and maintains its principal place of business at 14 Penn Plaza, Suite 1800, New York, New York, 10122.  Prager's website advertises its services as an accounting and consulting firm. Upon information and belief, Prager received fees and other remuneration for engagements or consulting work performed for the FTX Entities.  According to the California Secretary of State, the agent for Prager in California is Joseph Rust, 2381 Rosencrans Avenue, Suite 350, El Segundo, CA 90245.

43.     Defendants Armanino and Prager are sometimes referred to herein as the "Auditor Defendants."

## FACTUAL ALLEGATIONS

**I.      FTX'S FORMATION AND DEFENDANTS' FALSE REPRESENTATIONS CONCERNING HOW CUSTOMER ASSETS AND ACCOUNTS WOULD BE MAINTAINED AND USED**

44.     Alameda was founded in Berkeley, California in 2017 by Defendants Bankman-Fried and Wang. Alameda is a crypto-trading firm. Bankman-Fried served as CEO of Alameda until 2021, when he was succeeded by Ellison.

45.     In 2019, Bankman-Fried co-founded FTX, an abbreviation of "futures exchange," with Wang and Singh. FTX offered customers a range of trading products such as derivatives, options, volatility products, and leveraged tokens. FTX also provided spot markets in more than 300 cryptocurrency trading pairs, including its native token FTT/USDT. FTX's terms of service provided that customer assets belonged **solely** to the customer and would **not** be transferred or otherwise used in FTX's trading.  Bankman-Fried also consistently maintained that the FTX Entities and Alameda were separate and distinct, an assertion that new CEO Ray and federal regulators have indicated is false.

46.     FTX.US used a series of User Agreements, with at least three versions dated May 20, 2020, May 6, 2022, and September 16, 2022.  In each of these User Agreements for FTX.US, at Section 6, it was stated to customers the following: "Title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US."  Moreover, FTX.US's terms of service stated, in pertinent part (emphasis added):

    a.   As part of your FTX.US account, FTX.US provides qualifying users access to accounts for you to store, track, transfer, and manage your balances of cryptocurrency and/or dollars or other supported currency. ***All cryptocurrency or dollars (or other supported currencies) that are held in your account are held by FTX.US for your benefit.***

    b.   ***Title to cryptocurrency represented in your FTX.US Account shall at all times remain with you and shall not transfer to FTX.US.***

    c.   ***FTX.US does not represent or treat assets in your FTX.US Account as belonging to FTX.US.***

47.     Further, FTX Trading's terms of service stated, in pertinent part (emphasis added):

8.2.6. All Digital Assets are held in your Account on the following basis:

    a) ***Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading.*** As the owner of Digital Assets in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.

    b) ***None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading***; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading.

    c) ***You control the Digital Assets held in your Account***. At any time, subject to outages, downtime, and other applicable policies (including the Terms), ***you may withdraw your Digital Assets*** by sending them to a different blockchain address controlled by you or a third party.

48.    In addition, FTX.US's website has posted a document entitled, "FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms," stating that FTX "segregates customer assets from its own assets across our platforms." The document also represents that FTX maintained "liquid assets for customer withdrawals . . . [to] ensure a customer without losses can redeem its assets from the platform on demand." *See* https://www.ftxpolicy.com/posts/investor-protections (last visited December 15, 2022).

49.    As information about the true nature of the operations at the FTX Entities is being revealed in the Committee hearings, Ray's testimony and statements, and in detailed allegations in actions filed by regulators, the statements alleged herein about the manner of holding, and segregation of, customer assets at the FTX Entities and in the Accounts were materially false when made, and untrue. Accordingly, related statements made by FTX Entities (under the control and at the direction of the Individual Defendants) that FTX offered "the safest and easiest way to buy and sell crypto" or numerous statements by Bankman-Fried in connection with Congressional testimony he provided earlier in 2022 (as noted in fn. 11 herein, including that "FTX segregates customer assets from its own assets across our platforms") were also materially false and misleading statements when made.

II.     **IN ADDITION TO MISREPRESENTING THE ACCOUNTS IN TRANSACTIONAL DOCUMENTS SUCH AS THE USER AGREEMENTS, THE DEFENDANTS ENGAGED IN A MARKETING SCHEME THAT INCLUDED THE AUDITOR DEFENDANTS' AFFIRMATIVE STATEMENTS AND REPRESENTATIONS CONCERNING FTX'S FINANCIAL STATEMENTS**

50.     To achieve the mass accumulation of funds from customers, during the period from at least 2019 through November 2022, the Individual Defendants also caused the FTX Entities to engage in a promotional campaign.  Bankman-Fried became so well known in the cryptocurrency, investment, and financial markets that he soon was referred to just as "SBF." Bankman-Fried peppered media with Twitter posts, television and podcast interviews.  Celebrity "brand ambassadors" were also enlisted to tout the FTX Entities.  As alleged in paragraph 2 of the initial complaint in the CFTC Action, FTX ran a 2022 Superbowl commercial that advertised FTX as "the safest and easiest way to buy and sell crypto." FTX also paid social media influencers in lucrative sponsorship deals to promote their exchange and onboard new customers.

51.     As a result of the targeted promotional campaign undertaken at the direction of the Individual Defendants and aided by the Auditor Defendants (as alleged herein), FTX became one of the largest crypto-trading companies in the world, with nearly $15 billion in assets being traded on its platform daily.

52.     Central to making the scheme work was instilling confidence in customers and potential customers that the FTX Entities were subject to accounting oversight.  Accordingly, throughout 2021 and 2022, Bankman-Fried represented that the FTX Entities had purportedly completed several successful GAAP audits. For example, Bankman-Fried tweeted on July 31, 2021 that FTX was the "first (?) crypto exchange to complete a GAAP audit."  Similarly, Bankman-Fried tweeted on August 26, 2021 that FTX and FTX.US had officially passed US GAAP audits.

53.     FTX's website also contained a security policy noting the existence of 2021 audits and stated plans for future audits.  The website stated: "FTX has successfully undergone a US GAAP financial audit for 2021 and plans to continue undergoing regular audits."[9]  A similar

---

[9] *See* https://help.ftx.com/hc/en-us/articles/360031171351-Security-Policy (last visited December 14, 2022).

representation specific to FTX.US was available online in a document entitled "FTX US Regulation and Licensure Information" stating: "FTX US has successfully received a US GAAP financial audit."[10]

54.     In March 2022, Defendants Armanino and Prager, the FTX Entities' auditors, reportedly issued certified reports which found the FTX Entities to be in good financial health.

55.     Moreover, Armanino and Prager each went so far as to issue public statements in support of the FTX Entities and Bankman-Fried.  On December 8, 2021, Armanino tweeted "[l]et's go buddy!" while tagging Bankman-Fried in advance of one of the several occasions where Bankman-Fried testified before Congress about the FTX Entities and their trading platforms.[11]

**Armanino Digital Assets**
@ArmaninoCrypto                                          ...

Next up... @SBF_FTX Let's go buddy!

7:26 AM · Dec 8, 2021

1 Retweet    6 Likes

/ / /

/ / /

/ / /

---

[10] https://assets-global.website-files.com/625f3cf193eb0bdbf6469cba/62cdd5db020a38b180c56541_Regulatory%20and%20Consumer%20Disclosure%20Page.pdf#:~:text=West%20Realm%20Shires%20Services%20Inc.%20%28%22FTX%20US%22%29%20is,to%20consumers%20all%20applicable%20risks%20of%20the%20service (last visited December 15, 2022).

[11] Bankman-Fried testified before Congress on at least two other occasions in February and May 2022, making a series of false assurances about the "extremely successful" nature of the FTX.com exchange, the growing size of its "compliance and customer support," the "highly performant and reliable exchanges" of the FTX "platforms," that "FTX has designed and offered a platform with a market structure that is risk reducing," and that "FTX segregates customer assets from its own assets across our platforms," among other materially false and misleading statements concerning the FTX Entities.  The substance of the December 2021, February 2022 and May 2022 testimony of Bankman-Fried is available at the following links: https://www.ftxpolicy.com/posts/testimony-may-12; https://www.ftxpolicy.com/posts/testimony-feb-9 and https://www.ftxpolicy.com/posts/testimony-of-sam-bankman-fried-december-8-2021.

56.     In June 2022, Prager's website featured a photo stating that the firm was "proud to support FTX US."



### III.   THE AUDITOR DEFENDANTS FAILED TO COMPLY WITH GAAS AND IMPROPERLY FUNCTIONED AS "CHEERLEADERS" FOR THE INDIVIDUAL DEFENDANTS IN CONNECTION WITH THE MARKETING SCHEME

57.     The Auditor Defendants were required to comply with applicable GAAS when performing their audits and issuing reports thereon.  As described herein, the Auditor Defendants violated those professional standards and thereby reportedly provided audit opinions that allowed the Defendants to perpetuate the fraudulent scheme described herein.  Accordingly, in issuing the Audit Reports that reportedly stated that the financial statements of the FTX Entities' year end 2021 financial statements complied with GAAP, as well as making other supportive statements about the FTX Entities described herein, the Auditor Defendants violated GAAS and wrongly gave an air of legitimacy to the FTX Entities.

58.     Under GAAS, the objective of a financial statement audit is the expression of an opinion on the fairness with which the audited financial statements present, in all material respects, the financial position, results of operations, and the cash flows of the reporting entity, in conformity with GAAP.

59. To achieve this objective, the Auditor Defendants were responsible for planning and performing their financial statement audits to obtain "reasonable assurance" about whether the FTX Entities' financial statements were free of material misstatement under GAAP, including misstatements caused by fraud.

60. To identify the risks of material misstatements, the professional standards to which the Auditor Defendants were subject required them to perform the procedures identified in those standards. The following are a sample of the standards, but are not exclusive:

- The standard requiring an auditor to obtain a sufficient understanding of the company it is auditing, and its environment, including steps to "understand the events, conditions and company activities that might reasonably be expected to have a significant effect on the risks of material misstatement."

- The standard requiring an auditor to obtain an understanding of internal controls over financial reporting at the company being audited to (a) identify the types of potential misstatements, (b) assess the factors that affect the risks of material misstatement, and (c) design further audit procedures. An auditor's understanding of internal controls over financial reporting includes evaluating the design of controls that are relevant to the audit and determining whether the controls have been implemented. In this regard, an auditor is required to evaluate the extent to which existing control deficiencies are indicative of a fraud risk factor.

- The standard requiring an auditor to perform audit procedures designed to identify the areas that might represent specific risks relevant to the audit, including the existence of unusual transactions and events, and amounts, ratios and trends that warrant investigation.

- The standard requiring the auditor to design and perform the audit procedures in a manner that are specifically responsive to evident risks of material misstatement for each relevant assertion of each significant account and disclosure, including fraud risk.

- The standard requiring the auditor to evaluate the "reasonableness of accounting estimates" made by the company in the "context of the financial statements taken as a whole." The auditor should consider various factors, including "[d]eviations from historical patterns." Further, the auditor should "obtain an understanding of how [the company] developed the estimate" and, based on that, (a) "[r]eview and test the process used by management to develop the estimate"; (b) "[d]evelop an independent expectation of the estimate to corroborate the reasonableness of [the company's] estimate"; and (c) "[r]eview subsequent events or transactions occurring prior to the date of the auditor's report."

- The standards requiring adherence to the objective of a financial statement audit consisting of the expression of an opinion on the fairness with which the financial statements present, in all material respects, the financial position, results of operations and the cash flows of the reporting entity, in conformity with GAAP.

- The standards that impose upon auditors the responsibility of applying "due professional care," including the appropriate "professional skepticism." Professional skepticism requires the auditors to maintain a questioning mind and critically assess the audit evidence it obtains. In this regard, GAAS expressly requires that the auditors should not be satisfied with less than persuasive evidence beyond simply a belief that management is honest.

- GAAS standards also prohibit an auditor from issuing any unqualified opinion when it fails to gather sufficient appropriate audit evidence necessary to support its opinion. When audit evidence obtained from one source is inconsistent with that from another, or if the auditor has doubts regarding the reliability of audit evidence, auditors are required to perform additional audit procedures necessary to resolve the matter.

1
2
3

- GAAS also establishes the auditors' responsibility for identifying and responding to risks of material misstatement extended to those risks arising from fraud.

4  61.    Indeed, the Supreme Court has described the role of an independent auditor as that

5 of "public watchdog," established to improve the reliability of financial statements, enhance the

6 credibility of those statements and thereby, support the capital markets.  *United States v. Arthur*

7 *Young & Co.*, 465 U.S. 805 (1984).  As alleged herein, Armanino and Prager not only failed

8 entirely to conduct their work in accordance with the GAAS standards placed upon them as

9 auditors, but failed in their foremost charge to be "independent," as alleged herein. Auditors must

10 maintain independence in mental attitude in all matters relating to the audit.

11  62.    Armanino and Prager both failed at complying with the standard for auditor

12 independence.    As set out above, prior to Bankman-Fried's December 2021 Congressional

13 testimony about the FTX Entities, Armanino posted:

14
15
16
17
18
19

**Armanino Digital Assets**
@ArmaninoCrypto
···

Next up… @SBF_FTX Let's go buddy!

7:26 AM · Dec 8, 2021

1 Retweet  6 Likes

20 / / /
21 / / /
22 / / /
23 / / /
24 / / /
25 / / /
26 / / /
27 / / /
28 / / /

63.     In June 2022, Prager posted the following:



64.     As set forth in the Prager June 2022 post (above), Prager states that FTX.US "offer[s] U.S. traders a platform that inspires their loyalty."  Prager's "support" of FTX.US includes telling consumers that Prager has a "relationship" with FTX.US, that FTX.US is a "major player" in the crypto market, and that the platform offered "inspires . . . loyalty," a very meaningful endorsement from a large U.S. based auditing firm designed to provide comfort to customers and encourage use of FTX.US's services and offerings.

65.     As referenced in a recent December 5, 2022 online article by Going Concern News Desk entitled "If There Was a PCAOB in the Metaverse, It Would Probably Find a Bunch of Errors in Prager Metis's Audits Too" (the "December 5 Going Concern Article"), "[a]uditors should not be friends with their clients."  As a November 17, 2022 *Wall Street Journal* article astutely characterized the conduct, FTX's auditors acted like "crypto industry cheerleaders."  The December 5 Going Concern Article hearkens back to the "Let's go buddy" support Armanino voiced toward Bankman-Fried in connection with his December 2021 hearing before a Congressional committee, noting that making the statement "does not appear independent.  At all! Quite the opposite, actually! Let's try a little harder, people."

66.     The December 5 Going Concern article notes a particularly poorly timed Armanino tweet that it was a "great time to remember" Armanino's "specialized crypto assurance," a reference understood to be to a product that verifies customer assets held by crypto firms.  As the December 5 Going Concern article quips, "Okay, so the world's third largest crypto exchange—whose U.S. entity you provided assurance services to—is going down for the dirt nap, and you take it as an opportunity to plug your crypto assurance services?  I mean, a) Okay, but also b) NOT NOW.  The house is on fire, guys.  Maybe you could tell us about a home security system another time.?"

67.     In addition to the failure to comport with the independence standard, or conduct a GAAS compliant audit, the Auditor Defendants had several red flags of which they had notice: 1) the use of two auditing firms; 2) the number of interrelated parties forming the FTX Entities and Alameda; 3) that the FTX Entities did not reportedly have any internal accounting function or system of internal controls; 4) the use of offshore entities; 5) the loans Alameda made to certain of the Individual Defendants (as noted in Ray's testimony to the Committee, Bankman-Fried on at least one occasion was assigned as both the issuer and the recipient of the loan); 6) the experience level of management; 7) the lack of a formal and independent Board of Directors for the FTX Entities; 8) the nature of cryptocurrency trading and lack of meaningful regulatory oversight; and 9) that the FTX Entities' only accounting system was the use of Quickbooks.[12]  As replacement CEO Ray testified on December 13, 2022 before the U.S. House Financial Services Committee: "They used QuickBooks, a multibillion-dollar company using QuickBooks. Nothing against QuickBooks, it's a very nice tool, just not for a multibillion-dollar company."  As noted above, Ray emphasized that "[t]his really is old-fashioned embezzlement . . . This is just taking money from customers and using it for your own purpose.  Not sophisticated at all."  The importance of independence is not to be overlooked, as it is the bedrock of an auditor providing

---

[12] As covered in other media reports and in Ray's declaration set forth in the Bankruptcy Proceedings, expenses were coded with emojis for approval and employees received lavish perks.  *See e.g.*
FTX%20filing%20reveals%20slipshod%20accounting,%20freewheeling%20expenses,%20perks.html (last visited December 31, 2022).

professional services.  The PCAOB has sanctioned auditing firms for failing to comply with the standard over conduct that amounts to publicly advocating audit clients as investments.[13]

68.     Indeed, the nature of the fraudulent and improper financial accounting or reporting here was not something any auditor of reasonable diligence and following GAAS auditing standards would have missed.  The Auditor Defendants also had access to guidance from the PCAOB on auditing crypto assets, or any number of other sources in accounting literature.[14]

69.     Moreover, the Auditor Defendants each have publicly professed to being well versed in issues concerning cryptocurrency and the auditing needs related thereto.

70.     Prager, for example, maintained a copy of an October 2019 article on its website entitled "Accounting Professionals Need to Understand Cryptocurrency and Blockchain" and states "[s]imply put, blockchain = accounting ledger."[15]  Prager also advertises on its website as specializing in new technologies, claiming its "team of experts focuses on industries spanning in digital assets" and proudly represents it "is the first CPA to offer headquarters in the metaverse platform Decentraland."[16]  Similar statements are on a Prager webpage featuring its work for Digital Assets, wherein it states that Prager is "at the forefront of evolving regulations and actively participate in discussions regarding accounting policies in the cryptocurrency and blockchain industry."[17]

71.     Armanino's representations concerning its auditing and accounting prowess for cryptocurrency are equally touted on its website.  Among other things, Armanino advertises that it is the "first accounting firm to formalize and complete a 'Proof of Reserves' for a digital asset exchange.  With a combination of traditional audit and industry tools, we are able to provide much-

---

[13] https://pcaobus.org/news-events/news-releases/news-release-detail/pcaob-sanctions-two-firms-and-one-individual-for-auditor-independence-violations_712 (last visited December 18, 2022).

[14] https://pcaobus.org/Documents/Audits-Involving-Cryptoassets-Spotlight.pdf (last visited December 18, 2022).

[15] https://pragermetis.com/insights/accounting-professionals-need-to-understand-cryptocurrency-and-blockchain/ (last visited December 18, 2022).

[16] https://pragermetis.com/metaverse/ (last visited December 18, 2022).

[17] https://pragermetis.com/industries/digital-assets/ (last visited December 18, 2022).

needed transparency to users of virtual asset service providers."  The firm's website references it having the "first audit and assurance platform, on TrustExplorer . . . ."  As explained in one article, "[t]he Armanino TrustExplorer program is a proprietary, Armanino-owned and controlled software solution that offers asset-backed token projects and their holders a new level of trust and transparency, by providing a current, third-party view of the tokens in circulation and the related collateralized fiat funds (such as U.S. dollars) that back them."[18]  Further, a series of articles on the Armanino website also demonstrate its knowledge of what "best" accounting practices are for crypto startups and other advice.[19]

72.    In short, Armanino and Prager are self-professed cryptocurrency savvy auditors. Yet, the misconduct and financial failings here did not take specialization in cryptocurrency to uncover.  Within mere days to weeks of taking over as CEO, Ray found there was "no record keeping whatsoever" and a complete lack of internal controls.  As noted above, the SEC Bankman-Fried Action complaint in paragraph 51 alleges that the "[a]udited financial statements 'do not include information about Alameda's undocumented 'line of credit' from FTX" and "other information" that was"[a]t the very least, materially misleading.  Indeed, FTX's current CEO has voiced 'substantial concern as to the information presented in these audited financial statements.'"

73.    Given Ray's Congressional testimony as to the absence of records or proper documentation at the FTX Entities, and the lack of internal controls, data points that the auditors would either be required to examine or consider when undertaking an audit, Plaintiff alleges upon information and belief that the Auditor Defendants knowingly undertook the audit without the required documentation.

---

[18] https://medium.com/armanino-blockchain/armanino-trustexplorer-a-software-solution-for-the-future-of-digital-assets-e92a4482908a (last visited December 18, 2022).

[19] https://www.armanino.com/articles/crypto-startups-token-projects-thrive-with-accounting-best-practices/ (last visited December 18, 2022); https://www.armanino.com/articles/proof-of-reserves-elevating-trust-transparency-digital-asset-ecosystems/ (last visited December 18, 2022); https://www.armanino.com/articles/armanino-trustexplorer-a-software-solution-for-the-future-of-digital-assets/ (last visited December 18, 2022); https://www.armanino.com/articles/blockchain-crypto-resource-center/ (last visited December 18, 2022); https://www.armanino.com/articles/auditing-misconceptions-digital-assets/ (last visited December 18, 2022); https://www.armanino.com/software/trustexplorer/real-time-attest/ (last visited December 18, 2022).

74.     The Auditor Defendants were also on notice of the Bankman-Fried tweets and information posted on the websites of the FTX Entities announcing that they had been audited, and that such information was being communicated to actual and prospective customers (Plaintiff and the members of the Class) and others.

75.     As a result, the Auditor Defendants acted with knowledge and intent that customers and potential customers of the FTX Entities (which includes Plaintiff and the Class) would rely on the fact that the FTX Entities had financial statements and that those statements had been audited, particularly by U.S. based auditing firms with purported particularized knowledge and experience in the crypto space, in making their decision to have an Account with the FTX Entities or to transact business on the platforms of the FTX Entities.

76.     Ray testified on December 14, 2022 that the audits performed on the FTX Entities should not be relied upon.

77.     Ray's November 17, 2022 declaration in the Bankruptcy Proceedings states that the "FTX Group received audit opinions on consolidated financial statements for two of the Silos – the WRS Silo and the Dotcom Silo – for the period ended December 31, 2021."[20]  As stated by Ray, "I have substantial concerns as to the information presented in these audited financial statements, especially with respect to the Dotcom Silo.  As a practical matter, I do not believe it appropriate for stakeholders or the Court to rely on the audited financial statements as a reliable indication of the financial circumstances of these Silos."  Ray continues to declare on November 17, 2022 that the "Debtors are locating and securing all available financial records but expect it will be some time before reliable historical financial statements can be prepared for the FTX Group with which I am comfortable as Chief Executive Officer.  The Debtors do not have an accounting department and outsource this function."

78.     The November 17, 2022 Ray declaration also commented on the "unclear records and lines of responsibility" of the FTX Group's "approach to human resources," that the "Debtors

---

[20] Ray's November 17, 2022 declaration defines the FTX Group as consisting of the four Silos, which includes the FTX US entities as part of the "WRS" Silo and the FTX Trading entities as part of the "Dot Com" Silo.

did not have the type of disbursement controls that I believe are appropriate for a business enterprise" (noting an "on-line 'chat' platform where a disparate group of supervisors approved disbursements by responding with personalized emojis"), that the funds of the FTX Group were "used to purchase homes and other personal items for employees and advisors," that FTX Group "did not keep appropriate books and records, or security controls, with respect to its digital assets" and the "absence of daily reconciliation of positions on the blockchain."

79.     As set forth above, the violations of GAAS engaged in by the Auditor Defendants were knowing, including their violation of the independence standard as a result of their "cheerleading" conduct, described herein.  Based upon the facts concerning the accounting of the FTX Entities, as apparent to Ray in just a short period after serving as the new CEO, the Auditor Defendants knew that the Individual Defendants were engaged in the misconduct alleged herein. The Auditor Defendants provided substantial assistance to the FTX Entities and to the Individual Defendants by the issuance of the Audit Reports and the "cheerleading" efforts, alleged herein.

80.     Armanino is now reported in media as indicating it will not undertake future engagements for cryptocurrency-based clients.  This comes too late to save Plaintiff and the Class from the harm caused, as alleged herein.

**The Truth Begins To Emerge**

81.     On November 2, 2022, an article published by the cryptocurrency publication *CoinDesk* flagged issues about the financial condition of Alameda and the FTX Entities. The article, entitled "Divisions in Sam Bankman-Fried's Crypto Empire Blur on His Trading Titan Alameda's Balance Sheet" stated, in pertinent part:

> Billionaire Sam Bankman-Fried's cryptocurrency empire is officially broken into two main parts: FTX (his exchange) and Alameda Research (his trading firm), both giants in their respective industries.
>
> But even though they are two separate businesses, the division breaks down in a key place: on Alameda's balance sheet, according to a private financial document reviewed by CoinDesk. (It is conceivable the document represents just part of Alameda.)
>
> That balance sheet is full of FTX – specifically, the FTT token issued by the exchange that grants holders a discount on trading fees on its marketplace. While there is nothing per se untoward or wrong about that, it shows Bankman-Fried's

trading giant Alameda rests on a foundation largely made up of a coin that a sister company invented, not an independent asset like a fiat currency or another crypto. The situation adds to evidence that the ties between FTX and Alameda are unusually Close.

The financials make concrete what industry-watchers already suspect: Alameda is big. As of June 30, the company's assets amounted to $14.6 billion. Its single biggest asset: $3.66 billion of "unlocked FTT." The third-largest entry on the assets side of the accounting ledger? A $2.16 billion pile of "FTT collateral."

There are more FTX tokens among its $8 billion of liabilities: $292 million of "locked FTT." (The liabilities are dominated by $7.4 billion of loans.)

"It's fascinating to see that the majority of the net equity in the Alameda business is actually FTX's own centrally controlled and printed-out-of-thin-air token," said Cory Klippsten, CEO of investment platform Swan Bitcoin, who is known for his critical views of altcoins, which refer to cryptocurrencies other than bitcoin (BTC).

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Other significant assets on the balance sheet include $3.37 billion of "crypto held" and large amounts of the Solana blockchain's native token: $292 million of "unlocked SOL," $863 million of "locked SOL" and $41 million of "SOL collateral." Bankman-Fried was an early investor in Solana. Other tokens mentioned by name are SRM (the token from the Serum decentralized exchange Bankman-Fried co-founded), MAPS, OXY and FIDA. There is also $134 million of cash and equivalents and a $2 billion "investment in equity securities."

Also, token values may be low. In a footnote, Alameda says "locked tokens conservatively treated at 50% of fair value marked to FTX/USD order book."

Owners of the FTT token get discounts on FTX trading fees, increased commissions on referrals and earn rewards. The value of FTT is maintained by FTX's rolling program of buying back and burning tokens, a process that eats up a third of the exchange's trading commissions, which will continue until half of all tokens are burned, according to FTX.

82.     In the wake of the publication of the *CoinDesk* article, the FTX Entities saw massive customer withdrawals, resulting in a liquidity crisis.  On November 6, 2022, Binance, a competing crypto asset trading platform, commented that "[d]ue to recent revelations that have came [sic] to light," Binance would be liquidating its FTT holdings, which had been valued at the time at over $500 million.

83.     As recently laid out in chapter and verse in the initial complaint in the SEC Bankman-Fried Action, Bankman-Fried and Ellison acted to continue to cause harm to consumers by mispresenting the true financial condition of the FTX Entities.  Accordingly, Ellison tweeted an offer to buy Binance's holdings of FTT for $22 per token ("@cz_binance if you're looking to

minimize the market impact on your FTT sales, Alameda will happily buy it all from you today at $22!").

84.     Almost on cue, Bankman-Fried tweeted on or around November 7, 2022: "FTX is fine.  Assets are fine . . . FTX has enough to cover all client holdings.  We don't invest client assets (even in treasuries).  We have been processing all withdrawals, and will continue to be . . . .".  Upon information and belief, including the Ray December 13, 2022 testimony, Bankman-Fried's tweet was materially false and misleading because FTX, allegedly at his direction, had allowed Alameda to invest client assets, and in investments riskier than treasuries.  FTX was also not processing "all" withdrawals during the time of his twitter statement, as communicated by customer complaints on social media.

85.     Ultimately, by November 8, 2022, Bankman-Fried elected to freeze all withdrawals of customer assets.  As a result, the price of FTT declined by 80%, and Alameda's collateral on deposit had a value lower than the amount Alameda borrowed from FTX, as noted in the SEC Bankman-Fried Action, in paragraph 79.  This resulted in FTX having billions in unrecoverable loans out to Alameda.

86.     On November 8, 2022, competing cryptocurrency exchange Binance announced that it had reached a non-binding deal to acquire FTX. Upon information and belief, this potential transaction was part of Bankman-Fried's rushed effort to finding funding for FTX.  However, only one day later, Binance announced that "as a result of corporate due diligence" . . . [Binance had] decided that [it would] not pursue the potential acquisition of FTX[]" and that "the issues [were] beyond [Binance's] control or ability to help."  FTX customers withdrew approximately $5 billion from the platform that same day, according to the SEC Bankman-Fried Action.  Upon information and belief, and as alleged in paragraph 83 of the complaint in the SEC Bankman-Fried Action, Bankman-Fried "circulated a balance sheet to potential investors that listed a negative $8 billion entry labeled as a 'hidden, poorly internally labeled 'fiat@ account.'"  The "fiat@account" is reportedly a reference to the fiat@ftx.com account and as indicating FTX customer funds deposited in Alameda's bank accounts.

87.     According to an allegation in the SEC Bankman-Fried Action, during a November 9, 2022 meeting with Alameda employees, Ellison admitted that she, Bankman-Fried, and Singh were aware that FTX funds had been used by Alameda.  As set forth in a November 9, 2022 letter from Christina Rolle, Executive Director of The Securities Commission of The Bahamas ("SCB Executive Director Rolle"), Ryan Salame (Chairman of FTX Digital), client (a/k/a customer) assets held by FTX were transferred to Alameda in a manner that appeared to constitute misappropriation, and that only Bankman-Fried, Singh, and Wang had the codes and passwords to undertake these transfers.  The November 9, 2022 letter from Rolle was filed as Doc 225-4 in the Bankruptcy Proceeding (Case No. 22-11068-JTD).

88.     An affidavit dated November 10, 2022, signed by SCB Executive Director Rolle (the "Rolle Affidavit") was filed in the Bankruptcy Proceeding on December 14, 2022 (Doc 225-4 in Case 22-11068-JTD), wherein Rolle details a November 9, 2022 phone call she had with Salame and others identified by Rolle as including counsel for FTX Digital and FTX US. Salame's statements during that call, as relayed by Rolle, "exacerbated the need for the intervention of this Honourable Court on an urgent basis."

89.     The Rolle Affidavit declares that "[s]pecifically, Mr. Salame advised that clients' assets which may have been held with FTX Digital were transferred to Alameda Research" to "cover financial losses of Alameda."

90.     The Rolle Affidavit further declares that, during the November 9, 2022 call, she understood Salame to be "advising the Commission that the transfer of clients' assets in this manner was contrary to the normal corporate governance and operations of FTX Digital.  Put simply, that such transfers were not allowed or consented to by their clients."

91.     The Rolle Affidavit confirms that she was told that there were only three individuals with the necessary codes or passwords to transfer clients' assets to Alameda: Bankman-Fried and co-founders Nishad Singh and Zixiao Wang, according to the affidavit.  The Rolle Affidavit provides that Bankman-Fried is "Director Chief Executive Officer" of FTX Digital.

1    92.    Among other details, the Rolle Affidavit cites concerns over a November 9, 2022

2  e-mail she received from Bankman-Fried admitting to "poor risk management," that focus should

3  be on making "customers whole," and that "**we have segregated funds for all Bahamian**

4  **customers on FTX.  And we would be more than happy to open up withdrawals for all**

5  **Bahamian customers on FTX, so that they can, tomorrow, fully withdraw all of their assets,**

6  **making them fully whole.**"  Bankman-Fried's admission is simply another example of his

7  fraudulent and improper acts, as it calls into question the propriety of the bankruptcy filing and

8  whether Bankman-Fried caused the FTX Entities to make pre-filing preferential transfers of assets

9  that belong to Plaintiff and the Class.

10    93.    On November 10, 2022, Bankman-Fried issued a series of twenty-two tweets on

11  Twitter apologizing to customers and attempting to offer an explanation for the crash.



12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



SBF ✓
@SBF_FTX

5) The full story here is one I'm still fleshing out every detail of, but as a very high level, I fucked up twice.

The first time, a poor internal labeling of bank-related accounts meant that I was substantially off on my sense of users' margin.  I thought it was way lower.

6:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

6) My sense before:

Leverage: 0x
USD liquidity ready to deliver: 24x average daily withdrawals

Actual:

Leverage: 1.7x
Liquidity: 0.8x Sunday's withdrawals

Because, of course, when it rains, it pours.  We saw roughly $5b of withdrawals on Sunday--the largest by a huge margin.

6:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

7) And so I was off twice.

Which tells me a lot of things, both specifically and generally, that I was shit at.

And a third time, in not communicating enough.  I should have said more.  I'm sorry--I was slammed with things to do and didn't give updates to you all.

6:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

8) And so we are where we are.  Which sucks, and that's on me.

I'm sorry.

6:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

9) Anyway: right now, my #1 priority--by far--is doing right by users.

And I'm going to do everything I can to do that.  To take responsibility, and do what I can.

6:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

10) So, right now, we're spending the week doing everything we can to raise liquidity.

I can't make any promises about that.  But I'm going to try.  And give anything I have to if that will make it work.

6:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

11) There are a number of players who we are in talks with, LOIs, term sheets, etc.

We'll see how that ends up.

6:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

12) Every penny of that--and of the existing collateral--will go straight to users, unless or until we've done right by them.

After that, investors--old and new--and employees who have fought for what's right for their career, and who weren't responsible for any of the fuck ups.

6:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

13) Because at the end of the day, I was CEO, which means that "I" was responsible for making sure that things went well.  "I", ultimately, should have been on top of everything.

I clearly failed in that.  I'm sorry.

6:13 AM · Nov 10, 2022

SBF ✓
@SBF_FTX

14) So, what does this mean going forward?

I'm not sure--that depends on what happens over the next week.

But here are some things I know.

6:13 AM · Nov 10, 2022

**SBF** ✓ @SBF_FTX

15) First, one way or another, Alameda Research is winding down trading.

They aren't doing any of the weird things that I see on Twitter--and nothing large at all.  And one way or another, soon they won't be trading on FTX anymore.

6:13 AM · Nov 10, 2022

**SBF** ✓ @SBF_FTX

16) Second, in any scenario in which FTX continues operating, its first priority will be radical transparency-- transparency it probably always should have been giving.

Giving as close to on-chain transparency as it can: so that people know "exactly" what is happening on it.

6:13 AM · Nov 10, 2022

**SBF** ✓ @SBF_FTX

17) All of the stakeholders would have a hard look at FTX governance.  I will not be around if I'm not wanted.

All of the stakeholders--investors, regulators, users-- would have a large part to play in how it would be run.

Solely trust.

6:13 AM · Nov 10, 2022

**SBF** ✓ @SBF_FTX

18) But all of that isn't what matters right now--what matters right now is trying to do right by customers. That's it.

6:13 AM · Nov 10, 2022

**SBF** ✓ @SBF_FTX

19) A few other assorted comments:

This was about FTX International.  FTX US, the US based exchange that accepts Americans, was not financially impacted by this shitshow.

It's 100% liquid.  Every user could fully withdraw (modulo gas fees etc).

Updates on its future coming.

6:13 AM · Nov 10, 2022

**SBF** ✓ @SBF_FTX

20) At some point I might have more to say about a particular sparring partner, so to speak.

But you know, glass houses.  So for now, all I'll say is:

well played; you won.

6:13 AM · Nov 10, 2022

**SBF** ✓ @SBF_FTX

21) NOT ADVICE, OF ANY KIND, IN ANY WAY

I WAS NOT VERY CAREFUL WITH MY WORDS HERE, AND DO NOT MEAN ANY OF THEM IN A TECHNICAL OR LEGAL SENSE; I MAY WELL HAVE NOT DESCRIBED THINGS RIGHT though I'm trying to be transparent.  I'M NOT A GOOD DEV AND PROBABLY MISDESCRIBED SOMETHING.

6:13 AM · Nov 10, 2022

**SBF** ✓ @SBF_FTX

22) And, finally:

I sincerely apologize.

We'll keep sharing updates as we have them.

6:13 AM · Nov 10, 2022

94.     On November 12, 2022, *The Wall Street Journal* published an article entitled "Alameda, FTX Executives Are Said to Have Known FTX Was Using Customer Funds." The article stated, in pertinent part:

Alameda Research's chief executive and senior FTX officials knew that FTX had lent its customers' money to Alameda to help it meet its liabilities, according to people familiar with the matter.

Alameda's troubles helped lead to the bankruptcy of FTX, the crypto exchange founded by Sam Bankman-Fried. Alameda is a trading firm also founded and owned by Mr. Bankman-Fried.

Alameda faced a barrage of demands from lenders after crypto hedge fund Three Arrows Capital collapsed in June, creating losses for crypto brokers such as Voyager Digital Ltd., the people said.

In a video meeting with Alameda employees late Wednesday Hong Kong time, Alameda CEO Caroline Ellison said that she, Mr. Bankman-Fried and two other FTX executives, Nishad Singh and Gary Wang, were aware of the decision to send customer funds to Alameda, according to people familiar with the video. Mr. Singh was FTX's director of engineering and a former Facebook employee. Mr. Wang, who previously worked at Google, was the chief technology officer of FTX and co-founded the exchange with Mr. Bankman-Fried.

Ms. Ellison said on the call that FTX used customer money to help Alameda meet its liabilities, the people said.

Alameda had taken out loans to fund illiquid venture investments, the people said. On Friday, FTX, Alameda, FTX US and other FTX affiliates filed for bankruptcy protection.

Bankruptcy means that it could be a long time before individual investors and others owed their funds are able to potentially recover any of them, if ever.

95.    *The Wall Street Journal* article exposed that customer assets were being used to cover Alameda's trading losses and repay its outstanding debts.  Accordingly, this meant that Defendants were operating contrary to the express terms of the FTX Entities' terms of service and user agreements, which stated that customer assets would not be transferred to FTX trading.

96.    By November 11, 2022, Bankman-Fried had resigned as CEO of FTX and the FTX Entities and Alameda filed for bankruptcy. New CEO Ray provided a declaration in the Bankruptcy Proceedings declaring that he had never seen "such a complete lack of corporate controls and such a complete absence of trustworthy financial information as occurred here . . . the situation is unprecedented."

97.    On November 30, 2022, Bankman-Fried was interviewed via videoconference by Andrew Ross Sorkin of *The New York Times*, during which interview Bankman-Fried acknowledged: ***"I was responsible for doing the right things and I mean, we didn't. Like, we messed up big."***

98.     On December 12, 2022, Bankman-Fried was arrested in the Bahamas on the eve of what would have been roughly his fourth time providing testimony to a Congressional committee in a one-year period.  Accordingly, the scheduled Congressional testimony for December 13, 2022 was provided by Ray, wherein Ray confirmed a host of adverse facts about what his investigation to date into the FTX Entities had uncovered or confirmed.  Ray's testimony relayed a story that presents what for all intents and purposes sounds like a movie script where the truth is indeed stranger than fiction.

99.     As summarized in the prepared comments of Ray in connection with the December 13, 2022 Congressional testimony (available in Doc 225-3 in Case No. 22-11068-JTD in the Bankruptcy Proceedings), Ray states:

> While many things are unknown at this stage, and many questions remain, we know the following:
>
> First, customer assets from FTX.com were commingled with assets from the Alameda trading platform.
>
> Second, Alameda used client funds to engage in margin trading which exposed customer funds to massive losses.
>
> Third, the FTX Group went on a spending binge in late 2021 through 2022, during which approximately $5 billion was spent buying a myriad of businesses and investments, many of which may be worth only a fraction of what was paid for them.
>
> Fourth, loans and other payments were made to insiders in excess of $1 billion.
>
> Fifth, Alameda's business model as a market maker required deploying funds to various third party exchanges which were inherently unsafe, and further exacerbated by the limited protections offered in certain foreign jurisdictions.

100.    As Congresswoman Maxine Waters is quoted as saying in a December 12, 2022 press release issued even before the damning Ray testimony was provided, "Mr. Bankman-Fried must be held accountable . . . ."  Congresswoman Waters reiterated at the opening of the December 13, 2022 testimony Bankman-Fried needs to be held "accountable for the fraud he has committed and the harm he has caused."  In relaying the staggering losses, Congresswoman Waters aptly summarized: "Just a few months ago, FTX was one of the largest cryptocurrency exchanges in the world, with a valuation of $32 billion in just three years since its founding. Today, FTX is bankrupt and possibly looted.  FTX misused approximately $10 billion in customer

funds and owes creditors at least $3 billion dollars." Congresswoman Waters' statement expressed that she was "deeply troubled to learn how common it was among Bankman-Fried and FTX employees to steal from the cookie jar of customer funds to finance their lavish lifestyles."

101.    Following the December 13, 2022 hearing, Congresswoman Waters commented on the "extent of the fraud," highlighted SEC Chair Gensler's remarks on "massive noncompliance by crypto firms[.]" and noted "concern[] that the millions of customers who were lied to by FTX, are just the tip of the iceberg."

102.    *Forbes* released what is represented as the comments that Bankman-Fried planned to provide to the Congressional committee on December 13, 2022 if he had appeared, with the opening salvo summing it up: "I f****d up."[21]

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

103.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of a Class consisting of all persons other than Defendants that have deposited funds and/or assets in accounts ("Accounts") with FTX Trading LTD d/b/a FTX ("FTX or "the Company") or West Realm Shires Services Inc. d/b/a FTX US ("FTX.US" or "FTX US") (collectively, the "FTX Entities"), and who have been unable to access or withdraw the deposited funds and/or assets in the Accounts.

104.    Excluded from the Class are Defendants herein, the officers and directors of the FTX Entities, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

105.    The members of the Class are so numerous that joinder of all members is impracticable. Plaintiff and members of the Class are presently unable to withdraw their assets from FTX Accounts.   While Plaintiff, at this time, does not possess information on the exact number of Class members, and the number of such persons may only be ascertained through

---

[21] "Exclusive Transcript: The Full Testimony Bankman-Fried Planned To Give To Congress" https://www.forbes.com/sites/stevenehrlich/2022/12/13/exclusive-transcript-the-full-testimony-sbf-planned-to-give-to-congress/?sh=64fbb5a93c47 (last visited December 14, 2022).

appropriate discovery, Plaintiff believes that there are more than one million members in the proposed Class. For example, the FTX website currently posts a prepared statement for the May 12, 2022 testimony Bankman-Fried provided to the U.S. House Committee on Agriculture, in which it is stated: "At the time of this writing, the FTX platforms have millions of registered users, and the FTX US platform has around one million users."  Class members may be identified from records maintained by the FTX Entities or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in class actions. Alternatively, since one or more of the FTX Entities required customers to consent to receive communications electronically and to provide them with the customers' e-mail addresses, e-mail notice to Class Members may also be a suitable alternative to mail notice in this action.

106.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of laws that are complained of herein.

107.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

108.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Defendants violated Sections 17200, *et seq.* and 17500, *et seq.* of the California Business and Professions Code;

- whether the Defendants engaged in a conspiracy as alleged herein;

- whether other federal or applicable laws were violated by Defendants' acts as alleged herein;

- whether the Defendants aided and abetted the violations of law of each of the other Defendants as alleged herein;

- whether certain of the Accounts were unregistered securities under federal or applicable law;

- what the type and measure of damages suffered by Plaintiff and the Class may be;

- whether Plaintiff and Class members have sustained monetary loss and the value and extent of that loss;

- whether Plaintiff and Class members are entitled to injunctive and/or declaratory relief, both on their own behalf and in the public interest;

- whether Plaintiff and Class members are entitled to restitution, consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

- whether the Individual Defendants have been unjustly enriched and should be required to pay restitution and or disgorgement to Plaintiff and the Class.

109.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by certain of the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. No difficulty in the management of this action as a class action exists.

## COUNT I

**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200,** *et seq.*
**(Against the Individual Defendants on Behalf of Plaintiff and the Class)**

110.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

111.    This Count is asserted against the Individual Defendants and is based upon the California Unfair Competition Law ("UCL"), which prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200.

112.    The Individual Defendants' practices set forth herein were unlawful, fraudulent, and unfair, as set forth below.  These deceptive practices described herein are likely to mislead—and clearly have misled—consumers acting reasonably under the circumstances into depositing funds and/or assets into Accounts with the FTX Entities and/or maintaining such Accounts.

113.    **Unlawful**: The Individual Defendants have engaged in unlawful conduct in violation of the UCL in connection with statements and/or advertisements they each respectively issued to tout and/or advertise the FTX Entities and their products, including the Accounts, and/or

to cause consumers (*i.e.*, current and/or prospective customers of the FTX Entities) to sign up for the Accounts or other products or services of the FTX Entities.  In addition, as set forth herein, the FTX Entities, under the direction and control of the Individual Defendants, offered and/or sold unregistered securities in violation of applicable federal and state law.

114.    Specifically, as to the Individual Defendants, they touted and/or advertised the Accounts using false and/or misleading claims, including those alleged herein such that the Individual Defendant's actions are unlawful.  As alleged herein, each of the Individual Defendants violated California Business & Professions Code §§ 17500, *et seq.* (the "FAL").

115.    As set forth in the recent Indictment against Bankman-Fried, he is alleged to have engaged in wire fraud and conspiracy to commit wire fraud on customers, wire fraud and conspiracy to commit wire fraud on lenders, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, conspiracy to commit money laundering, and conspiracy to defraud the United States and violate campaign finance laws.  As set forth above, Ellison and Wang have plead guilty to the Superseding Information in *United States v. Caroline Ellison*, S2 22 Cr. 673 and in *United States v. Zixiao (Gary) Wang*, S1 22 Cr. 673.

116.    The SEC Actions allege fraud by the Individual Defendants in the offer or sale of securities in violation of Section 17(a) of the Securities Act of 1933, and fraud in connection with the purchase or sale of securities in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.  Ellison and Wang have entered consent judgments in the SEC Ellison/Wang Action.

117.    The CFTC Action filed against Bankman-Fried, Ellison and Wang alleges fraud in violation of Section 6c(1) of the Commodity Exchange Act, and Regulation 180.1(a)(1), (3) thereunder, and fraudulent misstatements of material fact and material omissions in violation of Section 6c(1) of the Commodity Exchange Act, and Regulation 180.1(a)(2) thereunder.  Ellison and Wang have entered consent judgments as to claims against them in the CFTC Action.

118.    Each of the Individual Defendants participated with Bankman-Fried in one or more of the acts and violations of law that are now alleged against Bankman-Fried, Ellison and Wang in the governmental actions alleged above.  The Individual Defendants caused the FTX Entities to

offer the Accounts, collected and/or controlled the funds and assets that customer deposited into the Accounts, and conducted business by or on behalf of the FTX Entities using the means and instruments of interstate commerce including by mail, internet, and other electronic means.  These activities set forth numerous unlawful acts that violate federal and state statutory and common law, and thus the Individual Defendants have committed unlawful acts in violation of the UCL and FAL.

119.   **Fraudulent**: A practice is "fraudulent" pursuant to the UCL if members of the general public were or are likely to be deceived.

120.   The Individual Defendants' statements regarding the legality, nature and viability of Accounts are deceptive to the public.  Bankman-Fried and the FTX Entities operated the activities of the FTX Entities in a manner alleged to be equivalent to a Ponzi-scheme, which conduct is fraudulent and deceives the public as to the viability and nature of the FTX Entities.

121.   **Unfair**: The conduct undertaken and engaged in by the Individual Defendants to market and sale the Accounts is, and was, unfair pursuant to the UCL because it was immoral, unethical, unscrupulous, or substantially injurious to consumers in inducing them to deposit funds into, and/or maintain funds in, Accounts with the FTX Entities when the Accounts were operated contrary to the Terms of Use and User Agreements and what was represented to consumers as alleged herein, including the omission of the material fact that the Accounts would be run in the nature of a Ponzi-scheme.

122.   The utility of the Defendants' conduct, if any, does not remotely outweigh the gravity of the harm to consumers, who were victims of the Defendants' misconduct. The Defendants' conduct with respect to the operation of the FTX Entities is unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers, can reasonably avoid. Plaintiff and the Class would not have deposited funds into Accounts with the FTX Entities had they known that the Individual Defendants' statements were in fact misrepresentations and deceitful.

123.   As alleged herein, the harm suffered by Plaintiff and the Class was directly and proximately caused by the deceptive and unfair practices of the Individual Defendants in violation

of Section 17200 related to the Accounts and the operation of the FTX Entities.  Plaintiff and the

Class lost money or property as a result of the Individual Defendants' conduct alleged herein.

124.    In accordance with California Business & Professions Code § 17203, Plaintiff

seeks an order enjoining the Individual Defendants from continuing to conduct business through

fraudulent, unlawful and unfair acts and practices.

125.    On behalf of the Class, Plaintiff also seeks an order for the restitution of all monies

made into Accounts with the FTX Entities, which were made resulting from acts of fraudulent,

unfair, or unlawful competition alleged herein.

## COUNT II

**Violation of California's False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(Against the Individual Defendants on Behalf of Plaintiff and the Class)**

126.    Plaintiff alleges each of the foregoing paragraphs as if fully set forth herein.

127.    This Count is asserted against the Individual Defendants and is based upon

California's False Advertising Law ("FAL"), which prohibits any statement in connection with

the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code § 17500.  Specifically,

Section 17500 provides, in pertinent part, that:

> It is unlawful for any person, firm, corporation or association, or any employee
> thereof with intent directly or indirectly to dispose of real or personal property or
> to perform services, professional or otherwise, or anything of any nature
> whatsoever or to induce the public to enter into any obligation relating thereto, to
> make or disseminate or cause to be made or disseminated before the public in this
> state, or to make or disseminate or cause to be made or disseminated from this state
> before the public in any state, in any newspaper or other publication, or any
> advertising device, or by public outcry or proclamation, or in any other manner or
> means whatever, including over the Internet, any statement, concerning that real or
> personal property or those services, professional or otherwise, or concerning any
> circumstance or matter of fact connected with the proposed performance or
> disposition thereof, which is untrue or misleading, and which is known, or which
> by the exercise of reasonable care should be known, to be untrue or misleading, or
> for any person, firm, or corporation to so make or disseminate or cause to be so
> made or disseminated any such statement as part of a plan or scheme with the intent
> not to sell that personal property or those services, professional or otherwise, so
> advertised at the price stated therein, or as so advertised.

128.    As alleged herein, the Individual Defendants made statements regarding the

Accounts and the FTX Entities that were untrue or misleading. In statements made (or

disseminated or caused to be made or disseminated) before the public in the State of California, or made (or disseminated or caused to be made or disseminated) from the State of California before the public in any state in the manner set forth in Section 17500, the Individual Defendants publicly represented, among other things, that FTX offered a viable and safe way to invest in crypto, and that the Accounts would be operated in the manner set forth in the Terms of Service and User Agreements.  These and other statements alleged herein were designed to deceive, and did deceive, consumers into investing with and/or maintaining investments with, the FTX Entities, including but not limited to the Accounts.

129.   The Individual Defendants' claims that Accounts and the FTX Entities were viable and safe for investing in crypto, or that the assets in the Accounts were segregated, among other representations alleged herein, were materially false due to the commingled nature of the FTX Entities' businesses and movement of the assets and/or funds in the Accounts, as demonstrated by the subsequent bankruptcy of the FTX Entities in the Fall of 2022 and the related governmental investigations and actions.

130.   The Individual Defendants knew, or in the exercise of reasonable care should have known, that all these claims relating to the FTX Entities and the viability and safety of, and terms of usage of, the Accounts were untrue or misleading. The Individual Defendants failed to adequately inform Plaintiff and the Class of the true nature of the Accounts and the FTX Entities.

131.   Plaintiff and other members of the Class opened Accounts with the FTX Entities and transferred money to those Accounts in reliance, in whole or in part, on the Individual Defendants' representations about the nature of the investments offered by the FTX Entities and Accounts, and their viability and safety, and would not have so invested or would have paid less for the investments if they had known the truth. When the truth about the FTX Entities and Accounts began to be publicly revealed, as alleged herein, harm resulted to Plaintiffs and the Class as a result of the FTX Entities' need for bankruptcy protection, and the resulting government investigations have begun to demonstrate the depth of the deceit practiced upon Plaintiff and the Class by the Individual Defendants and the business practices in which they caused the FTX Entities to engage or facilitated the FTX Entities to operate.

132.    Based upon the conduct alleged herein, the Individual Defendants are liable pursuant to Cal. Bus. & Prof. Code § 17500.

**COUNT III**

**Fraudulent Concealment**
**(Against the Individual Defendants on behalf of Plaintiff and the Class)**

133.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

134.    This Count is asserted against the Individual Defendants and is based upon the claim of fraudulent concealment under common law.

135.    The Individual Defendants omitted an existing fact about the FTX Entities and Accounts when they failed to disclose information regarding the true nature of the FTX Entities and Accounts, as alleged herein.  These omissions relate to the core purposes and operation of the Accounts as represented to Plaintiff and the Class.

136.    The omissions alleged herein by the Defendants are material because Plaintiff and the Class would not have transacted with the FTX Entities had they known true nature of the FTX Entities and Accounts.

137.    The Individual Defendants marketed and sold the Accounts and FTX's products and services to Plaintiff and the Class despite having knowledge of the true nature of the FTX Entities and the Accounts, as well as the financial condition of the FTX Entities.  The Individual Defendants, notably Bankman-Fried, caused FTX US and FTX Trading to represented that their financial statements conformed to GAAP and were audited.

138.    The Individual Defendants intended that Plaintiff and the Class would rely on the Individual Defendants' statements alleged herein, including those regarding the safety and nature of the FTX Entities and the Accounts, including the statements about GAAP, to increase the number of customers opening Accounts.

139.    Plaintiff and the Class were not aware of the true nature and lack of safety of the Accounts and the FTX Entities' platform and could not reasonably have discovered those true characteristics.  Similarly, Plaintiff and the Class were not aware of the true nature of the FTX

Entities' financial condition, lack of proper accounting procedures and internal controls, that the "[a]udited financial statements' do not include information about Alameda's undocumented 'line of credit' from FTX," or that the financial statements, as a result, were not compliant with GAAP, and could not reasonably have discovered those true characteristics.

140.    Plaintiff and the Class relied on the Individual Defendants' statements in that they deposited any amount of funds into Accounts with the FTX Entities, which they would not have done had they known that the assets and/or funds in the Accounts would not be segregated or used in the manner as alleged herein.

141.    Plaintiff and the Class had the right to rely on the Individual Defendants' statements and omissions that created the false impression that the Accounts were safe and reliable based on reasonable purchaser expectations that FTX would remain solvent, was handling their Accounts in conformity with the representations alleged herein, that the FTX Entities' financial statements were accurate and its practices conformed to the representations set forth herein, and that the Auditor Defendants had conducted a GAAS compliant audit in connection with issuing the Audit Reports, and had been independent while undertaking the engagement for the FTX Entities.

142.    The Individual Defendants had an affirmative duty to disclose the true nature of the FTX Entities and Accounts to prospective and actual customers and investors because they were in a superior position to know the true nature of the FTX Entities and Accounts.

143.    The Individual Defendants fraudulently concealed the nature of the FTX Entities, the financial condition of the FTX Entities, and the nature and use of customer funds deposited with, and into, the Accounts, and this conduct caused damage to Plaintiff and the Class.

## COUNT IV

### Negligent Misrepresentation
### (Against the Individual Defendants on behalf of Plaintiff and the Class)

144.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

145.    Plaintiff brings this claim against each of the Individual Defendants for negligent representation.

146. The Individual Defendants negligently and recklessly omitted certain material facts, including those alleged herein, regarding the FTX Entities and the Accounts including that the Accounts were safe and reliable, including that their funds and/or assets in the Accounts would be segregated and treated in accordance with the representations made to them by the Defendants. Based upon the statements made by the Individual Defendants alleged herein, Plaintiff and the Class are reasonable consumers and were entitled to expect that FTX would remain solvent and that the Accounts would be operated as promised.

147. A reasonable consumer is not in the same position as the Individual Defendants to know or detect that the financial statements of the FTX Entities and their operations were being conducted in a manner contrary to that represented.

148. The representations made by the Individual Defendants in connection with the FTX Entities and the Accounts were material and would have been considered by a reasonable consumer in making decisions to enter the Accounts or engage in any transactions with the FTX Entities.

149. Plaintiff and the members of the Class opened Accounts and transferred money or property to those Accounts believing that the Accounts would be operated in accordance with the representations made by the Individual Defendants and the FTX Entities.

150. As a result, Plaintiffs and members of the Class were directly and proximately injured by the Individual Defendants' negligence in failing to inform Plaintiff and members of the Class of the true nature of the operations of the Accounts and use of their assets and money contained within those Accounts.

## **COUNT V**

### **Intentional Misrepresentation**
**(Against the Individual Defendants on behalf of Plaintiff and the Class)**

151. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

152. The Individual Defendants represented to Plaintiff and the Class, as a true fact, that FTX's products and/or services were safe and reliable, and that the funds and/or assets used by

Plaintiff and Class members to open or fund Accounts would be segregated and not transferred to other entities.  The Individual Defendants also represented that the financial statements of FTX complied with GAAP.

153.    The representations of the Individual Defendants were false as alleged herein. Among other things, as stated in paragraph 51 of the complaint in the SEC Bankman-Fried Action, FTX's audited financial statements "do not include information about Alameda's undocumented 'line of credit' from FTX" and that other information discussed was "at the very least, materially misleading."  FTX's current CEO has now advised that those financial statements should not be relied upon and has been quoted as having "substantial concern as to the information presented in these audited financial statements."

154.    The Individual Defendants knew the representations were false when they made them because they controlled the FTX Entities and had full access to the information about the manner in which they were causing the FTX Entities to market, receive, and handle monies and assets from Plaintiff and the Class, and/or they made the representations recklessly and without regard for the truth of what was being represented.

155.    The Individual Defendants made the representations alleged herein with the intent to induce Plaintiff and the Class to rely on the representations.

156.    Plaintiff and the Class reasonably relied on the representations.

157.    Plaintiff and the Class were harmed and damaged.

158.    The reliance by Plaintiff and the Class on Individual Defendants' representations were a substantial factor in causing the harm to the Plaintiff and the Class.

## COUNT VI

### Fraud
### (Against the Individual Defendants on behalf of Plaintiff and the Class)

159.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

160.    At the time Plaintiff and Class members agreed to have an Account or opened an Account, the Individual Defendants did not disclose, but concealed and misrepresented the true facts related to the Accounts, as alleged herein.

161.    As detailed herein, the Individual Defendants represented to Plaintiff and the Class that FTX's Accounts, products and/or services were safe and reliable, and that the funds and/or assets used by Plaintiff and Class members to open or fund Accounts would be segregated and not transferred to other entities.   The Individual Defendants also represented that the financial accounting of FTX complied with GAAP.

162.    The representations of the Individual Defendants were false as alleged herein.

163.     The Individual Defendants knew, or should have known, that the representations were false when made they made them because they controlled the FTX Entities and had full access to the information about the manner in which they were causing the FTX Entities to market, receive, and handle monies and assets from Plaintiff and the Class, and/or they made the representation recklessly and without regard for the truth of what was being represented.

164.    The Individual Defendants also knew that the omissions and misrepresentations regarding the Accounts and the FTX Entities use of customer funds and assets were material, and that a reasonable consumer would rely upon Defendants' representations (and corresponding omissions) in making the decision to have an Account and send money or assets to the Defendants.

165.    The Individual Defendants in fact intended to deceive Plaintiff and Class members.

166.    Plaintiff and Class members did not know, nor could they have known through reasonable diligence, about how their monies and assets in the Accounts would be used by the Individual Defendants and the FTX Entities in the manner alleged herein that was contrary to the representations made to the Plaintiff and the Class.

167.    Plaintiff and the Class members were reasonable in relying on the Individual Defendants' misrepresentations (and corresponding omissions) in making their decision to send money or assets to the Individual Defendants for purposes of opening an Account.

168.    Plaintiff and Class members had a right to rely on the Individual Defendants' misrepresentations (and corresponding omissions) in making their decision to send money or assets to the Defendants for purposes of opening an Account.

169.    Plaintiff and Class members sustained damages as a result of their reliance on the Individual Defendants' omissions and misrepresentations, thus causing Plaintiff and Class members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT VII

**Breach of Fiduciary Duty**
**(Against the Individual Defendants on behalf of Plaintiff and the Class)**

170.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

171.    This Count is asserted against the Individual Defendants and is based upon their breach of fiduciary duty to Plaintiff and the Class.

172.    The Individual Defendants undertook to act on behalf of Plaintiff and the Class via the Terms of Use and User Agreements, wherein the Individual Defendants agreed, on behalf of the FTX Entities, to preserve the safety and security of the funds and/or assets in the Accounts that Plaintiff and the Class had deposited, paid, delivered and entrusted to the FTX Entities, as alleged in Section I of the Factual Allegations section alleged herein.  As a result of their undertaking to conform to the promises made in, among other representations, the Terms of Use and User Agreements, the FTX Entities and the Individual Defendants owed fiduciary duties to Plaintiff and the Class.

173.    The FTX Entities and the Individual Defendants breached their fiduciary duties to Plaintiff and the Class by, among other things, intentionally, knowingly, recklessly, willfully or negligently engaging in the acts and conduct as alleged herein, including failing to establish adequate internal controls, commingling the assets and/or funds deposited by Plaintiff and the Class in the Accounts as promised in the Terms of Service and User Agreements, applicable regulations and/or common law, misappropriating the assets and/or funds deposited by Plaintiff

and the Class in the Accounts, and/or permitting, authorizing and/or using funds and/or assets in the Accounts to be used by the FTX Entities and/or the Individual Defendants for their own purposes or for purposes not authorized by Plaintiff and the Class.

174.    As a direct and proximate cause of the breaches of fiduciary duty by the FTX Entities and the Individual Defendants, Plaintiff and the Class have been damaged and harmed in an amount to be determined at trial, and they have been unable to access or withdraw their funds and/or assets originally deposited in, or that were represented to be on deposit in, the Accounts.

## COUNT VIII

**Aiding and Abetting Fraud**
**(Against All Defendants on behalf of Plaintiff and the Class)**

175.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

176.    This Count is asserted against all Defendants for aiding and abetting the fraud undertaken by the Individual Defendants and the FTX Entities, as alleged herein.

177.    As alleged herein, the Individual Defendants made material misrepresentations and omissions to Plaintiff and Class Members regarding, among other things, the nature and safety of the FTX Entities and Accounts in order to induce confidence in the platform and Accounts, and convince consumers to open Accounts.

178.    Bankman-Fried entered into at least one agreement with the other Individual Defendants for the express purpose of making misrepresentations or omissions in order to induce and convince Plaintiff and consumers to invest in Accounts and put their money in the FTX Entities.

179.    Each of the Individual Defendants had knowledge of the fraud and wrongdoing by the other Individual Defendants and the FTX Entities as a result of their experience and relationship with the FTX Entities, and thus knew that the representations that the FTX Entities and the Individual Defendants made about, among other things, the FTX Entities' treatment and use of customer funds, financial condition, and conformity of the FTX Entities' accounting to GAAP were deceitful and fraudulent when made.  As a result, each of the Individual Defendants

provided substantial assistance to the other Individual Defendants in connection with the fraud alleged herein.

180.    In addition, the Auditor Defendants knew that the representations by the Individual Defendants and the FTX Entities, alleged herein, including that the financial statements of the FTX.US and FTX Trading entities conformed with GAAP, were deceitful and fraudulent when made.

181.    Armanino provided substantial assistance to the Individual Defendants and to FTX.US (*i.e.* the WRS Silo).  Prager provided substantial assistance to the Individual Defendants and to FTX Trading (*i.e.* the Dot Com Silo).  As alleged herein, each of the Auditor Defendants issued Audit Reports despite knowingly engaging in acts that violated auditor independence standards, and while knowing that the financial reporting and accuracy of the financial statements of the FTX.US entities (for Armanino) and the FTX Trading Entities (for Prager) were either materially misstated or lacking in proper support, based on the facts as described herein in Sections II and III of the Factual Allegations section.  Facts alleged herein further supporting the lack of independence and substantial assistance include Prager publicly stating its "support" of FTX.US and posting on media that it has a "relationship" with FTX.US.  Similarly, Armanino has tweeted support of Bankman-Fried as its "buddy."  Plaintiff alleges, upon information and belief, that the Auditor Defendants provided knowing and substantial assistance to the FTX Entities and the Individual Defendants in connection with the fraudulent conduct alleged herein.

182.    Defendants' conduct caused damages to Plaintiff and the Class in the amount of the money they invested in the FTX Entities that was lost as a result of the misconduct by the FTX Entities and the Individual Defendants that resulted in the insolvency and dissipation of customer assets.

## COUNT IX

**Aiding and Abetting Violations of Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(Against All Defendants on behalf of Plaintiff and the Class)**

183.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

184.    This Count is asserted against all Defendants and is based upon the violations of Section 17200 alleged herein by the Individual Defendants.

185.    The Individual Defendants each aided and abetted the other Individual Defendants in the unlawful, fraudulent, and unfair conduct alleged to violate Section 17200, *et seq.*, as alleged herein.

186.    As alleged herein, each of the Defendants knew the conduct of the FTX Entities and the Individual Defendants constituted violations of Section 17200 and each of the Defendants gave substantial assistance or encouragement to the FTX Entities and/or the Individual Defendants to so act.

187.    Each of the Defendants had knowledge of the fraud and wrongdoing by the FTX Entities as a result of their experience and relationship with the FTX Entities, and thus knew that the representations that the Individual Defendants made about, among other things, the FTX Entities' treatment and use of customer funds, financial condition, and conformity of the FTX Entities' accounting to GAAP were deceitful and fraudulent when made.

188.    In addition, the Auditor Defendants knew that the representations about the financial statements of the FTX Entities conforming with GAAP and other statements concerning the FTX Entities alleged herein, were deceitful and fraudulent when made. The Auditor Defendants facilitated the violations of statutory and common law alleged herein by providing the Audit Reports that the Auditor Defendants knew that the FTX Entities and the Individual Defendants would use to solicit and/or maintain customers. As a result, the Auditor Defendants provided substantial assistance or encouragement to the FTX Entities and/or the Individual Defendants to engage in violations of Section 17200.

189.    Defendants' conduct caused damages to Plaintiff and the Class in the amount of the money they invested in the FTX Entities that was lost as a result of the misconduct by the FTX Entities and the Individual Defendants that resulted in the insolvency and dissipation of customer assets.

**COUNT X**

**Aiding and Abetting Breaches of Fiduciary Duty**
**(Against All Defendants on behalf of Plaintiff and the Class)**

190.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

191.    This Count is asserted against all Defendants and is based upon the claims of breach of fiduciary duty by the Individual Defendants alleged herein.

192.    Each of the Individual Defendants aided and abetted the other Individual Defendants in the breaches of fiduciary duty, as alleged herein.  The Auditor Defendants also aided and abetted the breaches of fiduciary duty by the Individual Defendants, as alleged herein.

193.    As alleged herein, each of the Defendants knew the conduct of the FTX Entities and the Individual Defendants constituted a breach of fiduciary duty based upon the violations of statutory and common law alleged herein, and each of the Defendants gave substantial assistance or encouragement to the FTX Entities and/or the Individual Defendants to so act.

194.    Defendants' conduct caused damages to Plaintiff and the Class in the amount of the money they invested in the FTX Entities that was lost as a result of the misconduct by the FTX Entities and the Individual Defendants that resulted in the insolvency and dissipation of customer assets.

195.    As a direct and proximate cause of the breaches of fiduciary duty by the FTX Entities and the Individual Defendants, and the aiding and abetting of those breaches of fiduciary duty by each of the Defendants, Plaintiff and the Class have been damaged and harmed in an amount to be determined at trial, and have been unable to access or withdraw their funds and/or assets originally deposited in, or that were represented to be on deposit in, the Accounts.

**COUNT XI**

**Civil Conspiracy**
**(Against All Defendants on behalf of Plaintiff and the Class)**

196.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

197.    This Count is asserted against all Defendants and is based upon the claim of civil conspiracy under common law.

198.    The Individual Defendants made material misrepresentations and omissions to Plaintiff and Class Members regarding the nature and safety of the FTX Entities and Accounts in order to induce confidence in the platform and convince consumers to invest in what was a patently misleading and deceptive scheme, thus deceiving consumers and potential customers that their investments in the FTX Entities were safe.

199.    Bankman-Fried entered into at least one agreement with the other Defendants for the express purpose of making misrepresentations or omissions in order to induce and convince Plaintiff and consumers to invest in the Accounts and put their money in the FTX Entities.

200.    Defendants engaged in concerted unlawful acts, particularly in the form of misrepresentations and omissions made to Plaintiff and the Class for the purposes of inducing them to invest with the FTX Entities and in Accounts.  As set forth above, Ellison and Wang have plead guilty to the Superseding Information in *United States v. Caroline Ellison*, S2 22 Cr. 673 and in *United States v. Zixiao (Gary) Wang*, S1 22 Cr. 673.

201.    The conspiracy substantially aided the wrongdoing conducted by the FTX Entities and Bankman-Fried. Additionally, each of the Defendants had knowledge of the fraud and wrongdoing by the FTX Entities as a result of their experience and relationship with the FTX Entities, and thus knew or should have known that the representations that the Individual Defendants made about, among other things, the FTX Entities' treatment and use of customer funds, financial condition and conformity of the FTX Entities' accounting to GAAP were deceitful and fraudulent when made.

202.    In addition, the Auditor Defendants knew or should have known that the representations about the financial statements of the FTX Entities conforming with GAAP and other supportive statements concerning the FTX Entities alleged herein, were deceitful and fraudulent when made.

203.    This conspiracy caused damages to Plaintiff and the Class in the amount of the money they invested in the FTX Entities that was lost as a result of the misconduct by the FTX

Entities and the Individual Defendants that resulted in the insolvency and dissipation of customer assets.

### COUNT XII

**Conversion**
**(Against the Individual Defendants on behalf of Plaintiff and the Class)**

204.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

205.     This Count is asserted against the Individual Defendants.

206.     Plaintiff and the Class deposited funds and/or assets and maintained funds and/or assets in the Accounts, and Plaintiff and the Class each owned and had the right to possess the assets and/or funds in their respective Accounts.  Specifically, the FTX Entities and the Individual Defendants represented to Plaintiff and the Class that they had the right to withdraw their funds and/or assets in the Accounts, and that the funds and/or assets in the Accounts would be segregated, as set forth in the Terms of Use and User Agreements.  As set forth herein, the funds and/or assets in the Accounts were not maintained in accordance with the Terms of Use and/or User Agreements at all relevant times alleged herein, and the funds and/or assets in the Accounts have been converted by the FTX Entities and/or the Individual Defendants for purposes not set forth in the Terms of Use and User Agreements, have been misappropriated by the Individual Defendants and/or have been frozen due to the Bankruptcy Proceedings.

207.     The FTX Entities and the Individual Defendants substantially interfered with the funds and/or assets of the Plaintiff and the Class in their respective Accounts by knowingly and/or intentionally taking possession of the Property to use for purposes not authorized by the Plaintiff and the Class, spending the funds and/or assets in the Accounts for items not authorized pursuant to the Terms of Use and User Agreements, and/or refusing to return the funds and/or assets in the Accounts after customers demanded return of their assets and/or funds in the Accounts.

208.     Plaintiff and the Class did not consent to the use of their assets and/or funds in the Accounts in the manner alleged above.

209.     Plaintiff and the Class have been harmed by being denied access to, and possession of, their assets and/or funds in the Accounts.

210.     The conduct of the FTX Entities and the Individual Defendants was a substantial factor in causing the harm alleged herein to Plaintiff and the Class.

## COUNT XIII

### Unjust Enrichment
### (Against the Individual Defendants on behalf of Plaintiff and the Class)

211.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

212.     This Count is asserted against the Individual Defendants based upon the monetary benefits the Plaintiff and the Class conferred on these defendants in the form of their deposits of funds and/or assets into the Accounts that were used to continue the ongoing scheme alleged herein, including making it appear that the FTX Entities were functioning as represented to customers and others, and Plaintiff and the Class also unknowingly conferred a benefit on these defendants because these defendants misappropriated some or all of the funds and/or assets in the Accounts.  Plaintiff and the Class also conferred a benefit on these defendants based upon fees paid to the FTX Entities for transactions.

213.     The Individual Defendants have knowledge of the benefits conferred upon them by Plaintiff and the Class.

214.     The Individual Defendants should not be permitted, in good conscience and equity, to retain the funds and/or assets that they have received as a result of their misappropriation of customer funds and assets alleged herein.

215.     As a result of the Individual Defendants' conduct, Plaintiff and the Class suffered damages in the form of the transaction fees they paid to the FTX Entities, and in the loss of their assets and/or funds deposited into the Accounts that were misappropriated by the Individual Defendants or used for purposes not authorized pursuant to the terms of the User Agreements and Terms of Use.

216.     Plaintiff and the Class have no adequate remedy at law.

217.    Plaintiff, individually and on behalf of the Class, seeks restitution and disgorgement of funds (*i.e.*, monies or currency) and assets that the Individual Defendants have unjustly received as a result of their conduct alleged herein, as well as interest, reasonable attorneys' fees, expenses, costs to the extent allowable, as well as all other relief the Court deems necessary to make them whole.

218.    The Individual Defendants' conduct was willful, intentionally deceptive, and intended to cause economic injury to Plaintiff and the Class.  Plaintiff and the Class are therefore entitled to punitive damages.

## **COUNT XIV**

**Declaratory Judgment, Cal. Code Civ. Proc. § 1060**
**(Against the Defendants on Behalf of Plaintiff and the Class)**

219.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

220.    This Count is asserted against the Defendants under Cal. Code Civ. Proc. § 1060.

221.    There is a *bona fide* actual and present need for the declaratory relief requested herein; the declaratory relief prayed for herein deals with a present, ascertained or ascertainable state of facts, and a present controversy as to that state of facts; contractual and statutory duties and rights are dependent on those facts and law applicable to the facts; the parties have an actual, present, adverse, and directly antagonistic interest in the subject matter; and the antagonistic and adverse interests are all before this Court by proper process for final resolution.

222.    Plaintiff and the Class have an obvious and significant interest in the outcome of this action.

223.    Plaintiff and the Class deposited funds and/or assets into Accounts with the FTX Entities, based in part on justifiable reliance on the Defendants' statements and misrepresentations regarding the nature of Accounts and the FTX Entities' platform.

224.    If Plaintiff and the Class knew the true facts surrounding Accounts and the FTX Entities, including but not limited to that certain of the Accounts were used to solicit customers

for unregistered securities, Plaintiff and the Class would not have deposited funds and/or assets into Accounts with the FTX Entities.

225.    A justiciable controversy exists as to whether the Accounts were marketed, offered and/or sold illegally and whether the Defendants unlawfully and/or illegally solicited deposits of funds and/or assets from Plaintiff and the Class.

226.    Plaintiff and the Class thus seek an order declaring that certain of the Accounts were unregistered securities and were required to be registered with the SEC and state regulatory authorities, that the Defendants were required to disclose that certain of the Accounts were unregistered securities, that the Individual Defendants caused the FTX Entities to violate the Terms of Service and/or User Agreements by the acts perpetrated using customer assets as described herein, and that each of the Defendants received payment or financial benefits from misrepresenting the FTX Entities and Accounts to customers and potential customers of the FTX Entities, including Plaintiff and members of the Class.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class Counsel;

B.    Requiring Defendants to provide an accounting to Plaintiff and the Class, and to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class restitution and/or injunctive relief, including relief in the public interest to prevent further harm from, and/or rectify the harm that has resulted from, Defendants' misconduct;

D.    Requiring the Individual Defendants to return to Plaintiff and the Class any monies or assets they received and by which they are unjustly enriched;

E.      Requiring the Auditor Defendants to return, for distribution to the Plaintiff and the Class, any auditing, consulting, or other fees or payments they received in connection with any activities related to the FTX Entities;

F.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs, including any attorneys' fees pursuant to Cal. Code of Civil Procedure Section 1021.5; and

G.      Awarding such other and further relief as this Court may deem just and proper, including punitive damages.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

DATED: January 3, 2023

**KAPLAN FOX & KILSHEIMER LLP**

By: /s/ *Laurence D. King*
Laurence D. King

Laurence D. King (SBN 206423)
Kathleen A. Herkenhoff (SBN 168562)
Blair E. Reed (SBN 316791)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
Email: *lking@kaplanfox.com*
*kherkenhoff@kaplanfox.com*
*breed@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox (*pro hac vice* to be filed)
Joel B. Strauss (*pro hac vice* to be filed)
Jeffrey P. Campisi (*pro hac vice* to be filed)
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone:  212-687-1980
Facsimile:  212-687-7714
Email: *ffox@kaplanfox.com*
*jstrauss@kaplanfox.com*
*jcampisi@kaplanfox.com*

**WITES LAW FIRM**
Marc A. Wites (*pro hac vice* to be filed)
4400 North Federal Highway
Lighthouse Point, FL 33064

Telephone: (866) 558-9631
Email: *mwites@witeslaw.com*

*Counsel for Plaintiff and the Proposed Class*